## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim No. 1:22-cr-00354-RCL** |
| | : | |
| **RICHARD SLAUGHTER, and** | : | |
| **CADEN PAUL GOTTFRIED,** | : | |
| | : | |
| **Defendants.** | : | |

### UNITED STATES' RESPONSE TO DEFENSE MOTION TO DISMISS
### ALL COUNTS OF THE INDICTMENT ON FIRST AMENDMENT GROUNDS

The United States of America (the "government") respectfully submits this opposition to Defendants' Motion to Dismiss all counts of the indictment ("the Motion"), ECF No. 51. Defendants attempt to advance several main arguments and grounds for dismissal. First, they argue that "the First Amendment protects Slaughter and Gottfried's alleged conduct on January 6 as "political expression, advocacy, and petitioning" *Id*. at 1. Second, they argue that the defendants were denied due process because they "were given no path to challenge the political decree in this case." *Id*. at 5. Finally, the defendants argue that they were not provided notice that the Capitol was restricted on January 6, 2021, and that the First Amendment is a defense to trespass; they argue that to find otherwise would have a "chilling effect on Fundamental First Amendment Protections." *Id*. at 14.

Each of the defendants' grounds for dismissal lacks merit and this Court should deny the defendants' motion.

## I. BACKGROUND

### A.  Background regarding January 6, 2021

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The Joint

Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Michael Richard Pence presiding, a large crowd gathered outside the U.S. Capitol. "The mob [ . . . ] scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m. *Trump v. Thompson*, 20 F.4th 10, 10 (D.C. Cir. 2021).

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. The siege of the Capitol lasted for several hours and represented a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage and losses. The siege of the U.S. Capitol on January 6, 2021, was "the most significant assault on the Capitol since the War of 1812." *Trump*, 20 F.4th at 18-19.

**B. Facts Specific to this Case**

On January 6, 2021, at approximately 3:30 p.m., Richard Slaughter and his stepson, Caden Gottfried, were outside the Capitol building on the Lower West Terrace (LWT), near an area known as the "tunnel." The LWT tunnel was a narrow point of entry into the Capitol that was guarded by officers with the United States Capitol Police (USCP) and Metropolitan Police Department (MPD). Slaughter and Gottfried were among a large group of rioters engaged in a prolonged assault on USCP and MPD officers guarding the tunnel. As the government has articulated in another case, "the LWT Tunnel was the nucleus of violence; the core of aggression; the eye of bloodshed" on January 6. *See United States v. Stevens*, 21-cr-40 (TNM), Doc. 555 at 4.

At some point during the riot, Slaughter and Gottfried became separated. Gottfried made his way towards the entrance of the tunnel, and was observed entering the mouth of the tunnel while he and other rioters surged against the police line:



Figure 1                                     Figure 2

Figure 3          Figure 4          Figure 5          Figure 6

At approximately 4:00 p.m., Gottfried made it into the tunnel and pushed against the police line with his back. According to MPD Officer J.L., Gottfried used his bodyweight to push against the line of officers:



Figure 7

Gottfried was so disruptive that officers eventually pulled him through the police line and

detained him for several hours while the police battled to protect the Capitol Building:



Figure 8 showing Gottfried having been pulled through the police line and detained

While Gottfried was engaged in an assault on law enforcement, Slaughter was

independently committing acts of violence against the police.   At approximately 3:32 p.m.,

Slaughter was at the mouth of the tunnel using a police shield to push back against the police line:

4



Figures 9 and 10 showing Slaughter with a police shield

At approximately 3:47 p.m., Slaughter forcibly took a police baton from MPD Officer A.A. as Officer A.A. was guarding the tunnel:



Figure 11 showing Slaughter forcibly taking a baton from MPD Officer A.A.

Approximately 12 minutes later, at 3:59 p.m., Slaughter obtained a stick-like object and used it to assault police officers, including MPD Detective W.M.:

 

Figure 12                                    Figure 13



Figure 14

Approximately five minutes after this assault, at 4:04 p.m., Slaughter obtained a canister

of spray irritant and passed it to fellow rioter Cody Mattice. Mattice then used the spray handed to

him by Slaughter to assault MPD Officer M.A. inside the tunnel:[1]

---

[1] Mattice was charged in case number 1:21-cr-657-1 (BAH), pleaded guilty to a single violation of 18 U.S.C. 111(a)(1) and (b), and was sentenced to 44 months' imprisonment. Court records reflect that Mattice pled guilty to assaulting MPD Officer M.A. at this exact moment.



Figure 15



Figure 16

Sometime thereafter, Slaughter began looking for Gottfried. While on Capitol grounds, Slaughter gave a recorded interview to another individual, in which he described who he was looking for and why he was at the Capitol. A rough transcription of that exchange is as follows:

- Interviewer: Someone tells me you're looking for your son.
- Slaughter: Yeah. Caden Gottfried.
- Interviewer: And how old is he?
- Slaughter: He's 18.

7

- Interviewer: He's out here somewhere?
- Slaughter: He was right here a minute ago. I think he lost his phone.
- Interviewer: And from what you can tell, you can't find him?
- Slaughter: I can't find him, no. He's smart, he's strong, he's tall, I'm not worried about him, but I just want to connect with him.
- Interviewer: Where are you from?
- Slaughter: Washington State.
- Interviewer: Why are you here?
- Slaughter: I'm here because this is the last resort, it was statistically impossible to lose this election, and, uh, there's just nauseating amounts of fraud, and it's not being heard or seen, and we really have nothing left.
- Interviewer: Where do we go from here?
- Slaughter: I'm not quite sure, but I'm not leaving until we all know what we're gonna do.
- Interviewer: That's been one of my biggest questions when I first got here is how does everybody get resolve and leave?
- Slaughter: We don't leave. We stay united. And we take back our country.

Following the Capitol riot, Slaughter had a text message exchange with another individual

during which he stated the following:

Trum-p wanted to see if the patriots would have his back. If not, he would've probably con-seed-ed by now. Unarmed and unorganized it still happened, and by that I mean it wasn't a bre-ach...it was a take over. Had patriots been armed and organized they would've seized control of the government easily. Knowing it was impossible to hold that front with no armor and no arms, it was to send a message back to Tr-ump that we will fight for him. That was the war cry that was being screamed the whole time, he fought for us, we fight for him. Message received and now he's not backing down because he knows the will of the people is with him. Praying for his family big time.

## II. LEGAL STANDARDS

### A. Motion to Dismiss Standard

At the motion to dismiss stage, "an indictment is sufficient if it, first, contains the elements

of the offense charged and fairly informs a defendant of the charge against which he must defend,

and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the

same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Given these limited

8

requirements, it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)). *Accord United States v. Ring*, 628 F. Supp. 2d 195, 204 (D.D.C. 2009). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). Among the defects that a defendant can raise with the indictment are "constitutional challenges to the statute creating the charges offense." *United States v. Nordean*, 579 F. Supp. 3d 28, 40 (D.D.C. 2021) (citing *United States v. Stone*, 394 F. Supp. 3d 1, 7 (D.D.C. 2019); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)). "With respect to a constitutional challenge to statutes charged in an indictment or information, a defendant may challenge a statute as unconstitutional on its face or as unconstitutional as applied to his or her conduct." *United States v. Baez*, No. CR 21-0507 (PLF), 2023 WL 3846169 at *4 (D.D.C. June 2, 2023) (citing *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016); *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

"When considering a challenge to the indictment, 'a district court is limited to reviewing the face of the indictment'; the Court must 'presume the allegations [in the] indictment to be true.'" *Id.* (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (internal quotation marks omitted)) .Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence"

or the parties have agreed to a "stipulated record." *United States v. Yakou*, 428 F.3d 241, 246–47 (D.C. Cir. 2005) (emphasis added); *accord United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000) ("[u]nless there is a stipulated record … a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence"); *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("there is no summary judgment procedure in criminal cases."); 1A Wright & Miller, FEDERAL PRACTICE & PROCEDURE, CRIMINAL, § 195 (5th ed.) ("Rule 12 was [not] intended to permit 'speaking motions,' that is, motions challenging an indictment's sufficiency based on facts that are outside the pleadings.").

### B.  Facial Challenges under the First Amendment

In the First Amendment context, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 450 (2008). "To succeed in a typical facial attack, [a defendant] would have to establish that no set of circumstances exists under which [a statute] would be valid [ . . . ] or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (cleaned up). The Supreme Court recognizes a second type of facial challenge when dealing with First Amendment issues, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (cleaned up). The Supreme Court has recognized that to rule a statute as facially unconstitutional is "strong medicine" that it has employed "with hesitation, and then only as a last resort." *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (cleaned up). In a so-called "as-applied" challenge, the defendant would necessarily show that even if there are no constitutional issues with the statute as-written, it could still "be applied in such a manner as to stifle free expression." *Thomas v. Chi.*

*Park Dist.*, 534 U.S. 316, 323 (2002).

### C. As-Applied Challenges under the First Amendment at the U.S. Capitol

When assessing restrictions that the government seeks to place on the use of its own property, the Supreme Court has been consistent in holding that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. V. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)." First, one must establish if the government property in question is a public forum—one that "has traditionally been available for public expression"; or a designated public forum—one that the government "has opened for expressive activity by part or all of the public." *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992). Restrictions on both public and limited public forums are scrutinized using strict scrutiny. *Id*. By contrast, a nonpublic forum is "a space that a space that is not by tradition or designation a forum for public communication." *Minn. Voters All. V. Mansky*, 138 S. Ct. 1876, 1885 (2018). For nonpublic forums, restrictions must simply be "reasonable" and "not an effort to suppress expression." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Examples of nonpublic forums include airport terminals, *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 683; polling places on election day, *Minn. Voters All.*, 138 S. Ct. at 1886; and—notably for this analysis—the inside of the United States Capitol. *Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000) (Friedman, J.).

### III. ARGUMENT

The Defendants' Motion is a morass of undeveloped and meritless arguments parading under the banner of the First Amendment. This Court's analysis of the defendants' First Amendment challenge to the Indictment will necessarily be guided by the legal theories under

which the defendants proceed. But rather than presenting clear argument for the Court's consideration, the Motion has muddled several theories together leaving the government, and the Court, to guess at what the defense intended to convey. Defendants cite caselaw but do little to frame the legal issue or advance their claims. They do not identify whether they raise a facial or as-applied challenge. They do not make a claim as to whether the statute as written is content based or content neutral. They do not ask this Court to apply either strict scrutiny or the reasonableness standard. They do not even attempt to differentiate between the various charges for which they have been indicted, and instead simply assert that all their conduct–including allegations of robbery, numerous assaults on law enforcement, and civil disorder–are protected by the First Amendment. No precedent supports this broad claim.

This lack of clarity alone is a sufficient basis for the Court to deny the Motion. The D.C. Circuit has regularly disregarded claims or arguments when a movant fails to adequately develop a claim and when they assert but fail to properly analyze a claim. *See Barot v. Embassy of Zambia*, 773 F. App'x 6, 6 (D.C. Cir. 2019) ("The court declines to consider the other cursory arguments raised by appellant regarding this claim."); *SEC v. Banner Fund Int'l*, 211 F.3d 602, 613, (D.C. Cir. 2000) (noting that the court may disregard "asserted but unanalyzed" arguments); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments." (internal quotation marks and citations omitted)). The same result is warranted here.

A. **Defendants'** *Location* **Related Arguments**

Throughout their Motion, the defendants assert that they should have unfettered access to the United States Capitol. They claim, without citation to any kind of authority, "[e]very court

prior to January 6 has recognized that the Capitol is the Peoples' House, and a forum for political advocacy, petitioning, speech, assembly, and expression." Defendant's Motion at 7. Slaughter and Gottfried argue that *all* the counts charged are unconstitutional and overbroad and in violation of the First Amendment because, according to them, the charges seek to punish expression protected under the First Amendment. Slaughter and Gottfried assert that "allow[ing] this prosecution to go forward would dangerously chill expression and dissent by the American people." Defendants' Motion at 6. They are wrong.

Defense counsel has filed the same motion in other January 6 cases as was filed here, and in each case, the motion has been denied. *See Gray,* 2023 U.S. Dist. 2023 LEXIS 70431, at \*26-27; *Baez*, 2023 U.S. Dist. LEXIS 98766, at \*9-26. Other courts in this district have also rejected overbreadth challenges to the offenses alleged in the Superseding Indictment, *see Rhine*, 2023 U.S. Dist. LEXIS 12308, at \*29-49 (D.D.C. January 2023), and to a different statute with a broader prohibition on "any act to obstruct, impede or interfere" with law enforcement in the performance of official duties. 18 U.S.C. § 231(a)(3); *see, e.g., McHugh*, 583 F. Supp. 3d at 28-29; *Nordean*, 579 F. Supp. 3d, at 58.

When assessing restrictions that the government seeks to place on the use of its own property, the Supreme Court has been consistent in holding that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). First, one must establish if the government property in question is a public forum—one that "has traditionally been available for public expression"; or a designated public forum—one that the government "has opened for expressive activity by part or all of the public." *Int'l Soc'y for Krishna Consciousness*

*v. Lee*, 505 U.S. 672, 678 (1992). Restrictions on both public and limited public forums are scrutinized using strict scrutiny. *Id.* By contrast, a nonpublic forum is "a space that is not by tradition or designation a forum for public communication." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). For nonpublic forums, restrictions must simply be "reasonable" and "not an effort to suppress expression." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Examples of nonpublic forums include airport terminals, *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 683; polling places on election day, *Minn. Voters All.*, 138 S. Ct. at 1886; and—notably for this analysis—the inside of the U.S. Capitol. *Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000) (Friedman, J.); see also *United States v. Munchel*, --- F. Supp. 3d ---, 2023 U.S. Dist. LEXIS 67141, at *20 (D.D.C. 2023); *Nassif*, --- F. Sup. 3d ---, 2022 U.S. Dist. LEXIS 164181, at *4; *United States v. Rhine*, --- F. Supp. 3d ---, 2023 U.S. Dist. LEXIS 12308, at *43-44 (D.D.C. 2023); *United States v. Gray*, --- F. Supp. 3d --, 2023 U.S. Dist. 2023 LEXIS 70431, at *26-27 (D.D.C. 2023).[2]

As relevant here, other courts in this district have, concluded that, the Capitol building is not a public forum. *Bynum v. United States Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000) (Friedman, J.); *see also Baez*, 2023 WL 3846169 at *9. For one thing, government "ownership of property does not automatically open that property to the public." *Kokinda*, 497 U.S. at 725. And notwithstanding occasional access to the Capitol building by members of the public, the building is "not open to meetings by the public at large," and thus not generally "open

[2] Even if this Court were to engage in a fact dependent First Amendment analysis of defendants' conduct on January 6, the statutes under which defendant is charged are constitutional, as further detailed below.

14

to the public for limitless expression." *Bynum*, 93 F. Supp.2d at 56. In short, "Congress has not opened the Capitol as a public forum for free and open public discourse." *Id.* That was especially true on January 6, 2021, when security precautions for the Joint Session and the upcoming presidential inauguration *and* the ongoing global pandemic meant that the Capitol building was not open to the public at large. At least two other courts in this district have concurred with the court's analysis in Bynum. *See United States v. Nassif*, 21-CR-421 (JDB), ECF No. 42, at 3-11 (Bates, J.) (denying defendant's motion to dismiss 40 U.S.C. § 5104(e)(2)(G) count on First Amendment grounds); *United States v. Seitz*, 21-CR-279 (DLF), ECF No. 51 (Friedrich, J.) (same).

But even if the Capitol and its Grounds are public fora, courts have upheld temporary closures of traditional public fora for safety reasons. *See Mahoney*, 454 F. Supp. 2d at 21; *Menotti v. City of Seattle*, 409 F.2d 1113, 1129-1130 (9th Cir. 2005) (finding that an emergency order to close a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.2d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order'); *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of delegates).

Here, the Court can easily dispense with any facial or overbreadth challenge to the § 1752 and § 5104 counts charged in the Indictment. "[A] facial challenge fails because the plain text of

Section 1752(a)(1) clearly punishes conduct – unlawfully entering and remaining – and therefore does not reach 'a substantial amount of protected speech.'" *United States v. Baez*, No. CR 21-0507 (PLF), 2023 WL 3846169, at *5 (D.D.C. June 2, 2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008); *citing Virginia v. Hicks*, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)."); *United States v. Rhine*, 2023 WL 372044, at *11 (holding that Section 1752(a)(1) does not punish a substantial amount of protected speech)).

On January 6, 2021, the area around the Capitol had been lawfully closed and the defendants had no First Amendment right to breach that restricted perimeter. The Court should deny the defendants' motion, and should further preclude the Defendants from eliciting evidence, arguing, or asking questions that suggest that there was a First Amendment right to protest inside the restricted area around the Capitol on January 6.

The defendants' as-applied challenge to the Indictment based on the location of their conduct fails as well. First, an as-applied challenge is premature at the Rule 12 stage, because the analysis would require the Court to look beyond the Indictment. *See Baez*, No. CR 21-0507 (PLF), 2023 WL 3846169, at *6.

Nevertheless, the government submits that at trial, the government will show that the Capitol Grounds were restricted that day. There is no First Amendment right to protest in a restricted area. The government can—and on January 6, 2021, did—restrict an area that is a traditional public forum for legitimate government ends. This Court has affirmed that the government may close a public forum in similar circumstances. *See Mahoney v. U.S. Marshals*

*Service*, 454 F. Supp 2d 21, 32-33 (D.D.C 2006) (U.S. Marshals Service did not violate First Amendment by restricting access to sidewalk in front of St. Matthew's Cathedral for Red Mass, even though sidewalk was a traditional public forum).

Defendants' citation to *Adderley v. Florida*, 385 U.S. 39 (1966) (Defendants' Motion at 14), is inapposite. In *Adderley*, the Supreme Court did remark that protesting at a state capitol is different in character from protesting at a jail because "[t]raditionally, state capitol grounds are open to the public." *Id.* at 41. The context in which the Court made this observation, though, is of great import. In asserting that "traditionally capitols grounds are open to the public," the Court was extrapolating upon its decision in *Edwards v. South Carolina*, 372 U.S. 229 (1963). In that case, the Court struck down a statute that was "so broad and all-embracing as to jeopardize speech, press, assembly, and petition[.]" *Adderley*, 385 U.S. at 42 (*citing Edwards*, 372 U.S. at 237). It was this same doctrine of overbreadth, the *Adderley* Court noted, that rendered Louisiana's breach-of-the-peace statute unconstitutional. *Id.* (*citing Cox v. Louisiana*, 379 U.S. 536, 551-552 (1965)). The Court's statement about capitols being traditional public fora was not, as the Defendant asserts, a holding that any regulation that limits First Amendment activities on any capitol ground ever is unconstitutional. It was, instead, a truism that supported the holding from *Edwards* that a statute or regulation that was so overbroad and all-embracing such that it prohibited, in effect, any First Amendment activity on capitol grounds at any time is unconstitutional. *Adderley*, 385 U.S. at 42.

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds. That restricted perimeter was for a legitimate government purpose.

17

No member of the public, including the defendants, had a First Amendment right to engage in protest or speech within that restricted area. Because the charged conduct here does not implicate protected First Amendment expression, defendants' challenge fails at the outset. The Court should therefore deny the defendants' motion and additionally enter an order precluding the defendants from arguing to the contrary or stating during *voir dire*, questioning, or opening or closing statements that Defendants were engaged in protected speech or pursuing their "right" to protest at any point when they were on U.S. Capitol grounds.

### B.  Defendants' *Conduct* Based Arguments

To the extent that the defendants' Motion is designed to argue that their conduct was lawful, not only because of the *location* of their conduct within a purported public forum, but that their actual *conduct* was expressive, that argument also fails.

The defendants do not characterize what, if any, role they played on January 6, but insinuate that they were merely demonstrating on Capitol grounds. *See* Defendants' Motion at 13-14. They argue that their prosecution therefore "conflicts with settled First Amendment law." ECF No. 154, at 10. But again, as an as-applied challenge, the challenge is premature, because it depends on factfinding as to what the defendants' conduct actually was. *See Baez*, No. CR 21-0507 (PLF), 2023 WL 3846169, at *6.

As a facial challenge, the Motion also fails. With respect to Counts 1-4 and 9-11, (Robbery, Assault, Civil Disorder, and Engaging in Physical Violence), there can be no serious argument that these statutes are unconstitutional on their face.  By the defendants own admission, "[i]n general, violence is not First-Amendment protected."  Defendant's Motion at 11.

With respect to Counts 5-8 (Entering/Remaining in a Restricted Perimeter, Disorderly

18

Conduct, and Parading, Demonstrating, and Picketing), these restrictions are content-and viewpoint-neutral and therefore subject to intermediate scrutiny. Multiple courts have found that these restrictions, in the context of a non-public forum such as the Capitol Building and Grounds, or within a restricted perimeter, are reasonable regulations of conduct and speech, given the government's interest in protecting Secret Service protectees, elected members of Congress, and the legislative process within the building. *See Baez,* 2023 WL 3846169 at *9-10.

### C.  The Defendants' Due Process Rights Have Not Been Violated

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Defendants appear to argue that they were not given an opportunity to challenge the establishment of the restricted perimeter around the Capitol. This is premature. There is currently no evidence of Slaughter and Gottfried's precise conduct before the Court; the record consists of

the allegations in the indictment. Slaughter and Gottfried may raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). No record of the defendants' conduct yet exists in this case, which involves Slaughter and Gottfried's participation in a riot at the United States Capitol that involved significant violence against police officers and forced lawmakers meeting in a joint Session to evacuate from their respective chambers. This Court should therefore deny their due process challenges as premature.

**D. Defendants' Were Provided Adequate Notice of the Restricted Perimeter**

Lastly, the defendants argue that they were not provided adequate notice of the restricted perimeter, and, alternatively, the First Amendment is a defense to trespass. These arguments also fail.

The grand jury charged the defendants with several offenses each based on their violent and obstructive conduct, not their speech. The charged conduct includes committing robbery, assaulting law enforcement, interfering with officers, and entering restricted grounds. Open-source, Capitol Police security footage, and MPD body-worn camera footage show both Slaughter and Gottfried breaching the Capitol's restricted perimeter, physically resisting efforts by law enforcement officers to keep the angry mob at bay, repeatedly assaulting police officers, and taking property by force, among other conduct.

"No matter defendants' political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." *United States v. Nordean*, 579 F. Supp. 3d 28, 53 (D.D.C. 2021); *see also, e.g., United States v. Bozell*, No. 21-CR-216 (JDB), 2022 WL 474144, at *7 (D.D.C. Feb. 16, 2022) (defendant "is not being prosecuted

for exercising his First Amendment rights to peacefully protest outside the Capitol, but rather on

the [allegation] that he corruptly used force to disrupt the January 6 Certification."). Furthermore,

none of the offenses with which the defendants are charged punishes speech, unlike crimes such

as threats or solicitation do. Even if some aspects of the defendants' conduct were protected by the

First Amendment, it would still not negate criminal action for their unprotected conduct because

"when speech and nonspeech elements are combined in the same course of conduct, a sufficiently

important governmental interest in regulating the nonspeech element can justify incidental

limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

That is to say that even if a defendant is engaged in speech that is protected, when his actions turn

physically obstructive or outright violent, the First Amendment ceases to protect the speech itself

because the government has a legitimate interest in preventing or stopping violent conduct. *Id.*

These principles have been upheld in the context of January 6 cases, including in recent

cases involving charges beyond any § 5104 charges. *See, e.g., United States v. Bozell*, No. 21-CR-

216 (JDB), 2022 WL 474144, at *7 (D.D.C. Feb. 16, 2022) ("And to the extent that any of Bozell's

alleged crimes did constitute constitutionally protected expressive conduct, a proposition this

Court strongly doubts, the Court concludes that Bozell's prosecution is still constitutional under

*United States v. O'Brien*, 391 U.S. 367 (1968)."); May 20, 2023 Minute Order, *United States v.

Thomas*, 21-cr-552-DLF (In case involving charges under 18 U.S.C. §§ 1512, 231, 111, 1752, and

§ 5104: "For all the reasons stated from the bench on May 19, 2023, the defendant's 136 Motion

for Mistrial on First Amendment Grounds is DENIED. As the Court stated repeatedly, the

government is permitted to introduce protected speech 'to establish the elements of a crime or to

prove motive or intent.' *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).") (rejecting First

Amendment-based challenge to identical charges as Gray's); *United States v. Alberts*, 21-cr-26 (CRC), Trial Tr., April 11, 2023 at 261-63 ("With respect to the First Amendment defense, the Court previously ruled that there is no First Amendment right to engage in assaultive or other unlawful conduct.") (citing ECF No. 77 at 9-12) ("Alberts contends that prosecuting him under the statutes underlying counts one, two, five, seven, and eight violates the First Amendment because he 'had a constitutional right to protest regarding his perceptions of unfair election tabulation.' Because the 'U.S. Capitol must be [] accessible to the citizenry,' his argument goes, it is 'perhaps the place in America where government has the least authority to restrict citizen presence, petitioning, demonstrating, and activism.' This argument fails.") (citations omitted); ECF No. 57 at 16-20, *United States v. Lesperance*, 21-cr-575-JDB (denying motion to dismiss 1752 and 5104 charges on First Amendment grounds and rejecting argument that "there is no law of Congress which makes the Capitol a restricted building") (citing, *e.g.*, *United States v. McHugh*, 583 F. Supp. 3d 1, 29-35 (D.D.C. 2022); ECF No. 79, *United States v. Rhine*, Crim. A. No. 21-687 (RC) (D.D.C. Jan. 24, 2023)).[3]

None of Slaughter and Gottfried's illegal conduct is sanctioned by the First Amendment, and the Court should preclude the defendants from arguing so.

### IV. CONCLUSION

WHEREFORE, the United States, respectfully requests that this Court deny defense's motion.

---

[3] *See also* July 28, 2023 Order (ECF No. 151), *United States v. Kastner*, 21-cr-725-MAU (denying First Amendment motion to dismiss §§ 1752 and 5104 charges); June 6, 2023 Order (ECF No. 43), *United States v. Baez*, 21-cr-507-PLF (same); *also, e.g.*, January 24, 2023 Order (ECF No. 78), *United States v. Rhine,* 21-cr-687-RC (same).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    /s/ Stephen J. Rancourt
       Stephen J. Rancourt
       Texas Bar No. 24079181
       Assistant United States Attorney, Detailee
       601 D Street, NW
       Washington, D.C. 20530
       Phone: (806) 472-7398
       Email: stephen.rancourt@usdoj.gov

       /s/ Katherine E. Boyles
       Katherine E. Boyles
       Assistant U.S. Attorney
       D. Conn. Fed. Bar No. PHV20325
       United States Attorney's Office
       601 D Street NW
       Washington, D.C. 20001
       Phone: 203-931-5088
       Email: katherine.boyles@usdoj.gov