# Metropolitan Police Department
## Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations



Revised: January 20, 2011

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION……………………………………………….. | **4** |
| II. | POLICY………………………………………………………... | **4** |
| III. | PLANNED/PERMITTED FIRST AMENDMENT ASSEMBLIES……….. | **6** |
| IV. | UNPLANNED EVENTS…………………………………………… | **7** |
| V. | VIOLENT CIVIL DISTURBANCES………………………………... | **10** |
| VI. | ORGANIZATION OF CIVIL DISTURBANCES…………………….. | **13** |
| VII. | COMMAND ASSIGNMENTS AND RESPONSIBILITIES……………... | **14** |
| VIII. | FULL MOBILIZATION OF PERSONNEL IN SUPPORT OF EVENTS... | **16** |
| IX. | OPERATIONAL PROCEDURES FOR MASS DEMONSTRATIONS…... | **18** |
| X. | CONSEQUENCE MANAGEMENT……………………………............ | **25** |
| XI. | APPENDICES…………………………………………………… | **26** |

| | | |
|---|---|---|
| A. | JOC/CIC Activation and Operations…………………………….. | A-1 |
| B. | Public Information During Large Scale Events and Demonstrations……………………………………………… | B-1 |
| C. | Mass Demonstration Event Log…………………………………….. | C-1 |
| D. | Warning Format for Mass Arrests……………………………….. | D-1 |
| E. | Pre-Mass Arrest Checklist……………………………………….. | E-1 |
| F. | Mass Arrest Procedures………………………………………….. | F-1 |
| G. | Field Arrest Forms……………………………………………….. | G-1 |
| H. | Mass Arrest Prisoner Processing and Control…………………… | H-1 |
| I. | Legal Charges for Unlawful Mass Demonstrations……………… | I-1 |
| J. | Rights Notification Forms……………………………………….. | J-1 |
| K. | CDU Use of Force……………………………………………….. | K-1 |
| L. | Internal Investigations for Use of Force and Misconduct………… | L-1 |
| M. | First Amendment Assembly Provisions of the First Amendment Rights and Police Standards Act of 2004………………………… | M-1 |
| N. | Records Retention……………………………………………….. | N-1 |

I.      **INTRODUCTION**

The Standard Operating Procedures (SOP) outlined in this manual are to ensure that this department is prepared to respond effectively and efficiently in accordance with applicable law and District of Columbia policy to any unlawful conduct occurring in the context of First Amendment assemblies.  These SOP's incorporate revisions to the manner in which the Metropolitan Police Department responds to demonstrations and other assemblies on District of Columbia public space that the District has implemented in resolving litigation.  This manual also reflects measures mandated by the First Amendment Rights and Police Standards Act of 2004.

This handbook sets forth general policy and shall serve as standard operating procedures for all members in carrying out the mission of the Metropolitan Police Department in dealing with all demonstrations, rallies, marches, picket lines, or other similar gatherings conducted for the purpose of persons expressing their political, social, or religious views.  This policy is intended to exceed constitutional requirements and satisfy the heightened requirements of local statutory law and best practices.

The manual also is designed around the concept of operational flexibility within the requirements of the National Incident Management System.  It is impossible to devise specific standard procedures for handling all possible situations, for each has its own characteristics and problems. The overall police philosophy must be one of moderation, flexibility and controlled response.  Since each situation is unique, both commanders and supervisory officials must plan to respond according to the nature and size of the crowd.  The tactical procedures established within this manual are a guide, and not a substitute for the exercise of sound judgment and proper command and supervision within the context of general departmental policy.

It is imperative that members of the force understand the role of the Metropolitan Police Department during mass demonstrations and major disturbances in our city and the manner by which the department prepares itself to fulfill this role.  It is to this end that this handbook is dedicated.

II.     **POLICY**

A.      Statement of Policy

It is the declared policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia, and to engage in First Amendment assembly near the object of their protest so they may be seen and heard, subject to reasonable restrictions designed to protect public

safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways to travel to their intended destinations, and use the parks for recreational purposes.

It is the statutory responsibility of the Metropolitan Police Department to preserve the public peace, to prevent crime, arrest offenders, and to protect the rights of persons and of property.  As part of this responsibility, the department provides trained personnel to respond to the scene of First Amendment assemblies in our city in order to preserve peace while protecting the constitutional and statutory rights of people to assemble peacefully and exercise free speech.  In fulfilling these responsibilities, the department will make reasonable efforts to employ non-arrest methods of crowd management as the primary means of restoring order.  Should such methods prove unsuccessful, arrests shall be made for violations of the law.  All arrests shall be based on probable cause, and arresting officers shall use only the minimum necessary force to make and maintain the arrest.  To the extent possible under the circumstances, arrests shall be made in an organized manner by units at the direction of the Chief of Police or his/her designee.   All arrests shall be fully documented.  Prisoners shall be safeguarded and adequately cared for, and shall be expeditiously processed for court or release.

The Council for the District of Columbia has enacted the **First Amendment Rights and Police Standards Act of 2004.**  This act contains First Amendment Assemblies provisions that control this department's responses to demonstrations.  The Metropolitan Police Department shall comply with all provisions of this act while providing police services during any First Amendment event.  The First Amendment Assemblies provisions are contained within Appendix M.

It is the policy of MPD to index, retain and store all documents (originals and copies) for a period of no less than three (3) years.  The provisions for the records retention are contained within Appendix N.

B.     Organizational Policy

The Chief of Police, or an official or officer designated by him/her Directly, through operation of the chain of command, by virtue of deployment of personnel pursuant to an operational plan or in response a First Amendment assembly, or lawful order, will be the Incident Commander at scenes of First Amendment assemblies.

Incident Command responsibility, once established, does not pass from one officer or official to another simply by virtue of the appearance or arrival at the scene of  a First Amendment assembly of an official senior in

rank to the officer or official operating as the Incident Commander.
Incident Command responsibility passes in such instances only upon
acceptance of that responsibility by the senior official.

### III.     PLANNED/PERMITTED FIRST AMENDMENT ASSEMBLIES

Planned events are those that the department is aware of in advance, either
through the submission of a permit request or other means that allow for the
advance planning of resources and response procedures.  When large-scale
planned/permitted First Amendment assemblies are anticipated:

1.     The Chief of Police will designate command official(s) to serve as
       Area or Incident Commander(s) at various sites to manage events.

2.     During First Amendment protected demonstrations, Incident
       Command responsibility, once established, does not pass from one
       officer to another simply by virtue of the arrival of a member of
       higher rank.  Incident Command responsibility passes only in such
       instances when the higher-ranking official assumes command and
       informs the lower ranking official.

3.     The Commander, Special Operations Division, under the direction
       of the Chief of  Police, is responsible for preparing the necessary
       details and tactical plans for events that are scheduled to occur
       within the District of Columbia.  In this capacity he/she shall:

       a.     Coordinate all aspects of the event plan with the affected
              elements, units and personnel;

       b.     Coordinate activities with other law enforcement, D.C.
              Government and federal agencies, as necessary; and

       c.     Designate liaison officers to deal with demonstration
              leaders before, during, and after the demonstration.

4.     Planning Committees

       In order to perform its mission of protecting the rights of
       demonstrators, counter-demonstrators, and non-demonstrators
       alike, it is the policy of the MPD to engage in advance planning to
       facilitate demonstrations where the Department is provided
       advance notification through the permit application process or
       learns of a planned First Amendment assembly.
       Creation of various subcommittees:  The subcommittees that are
       convened will be dependent upon the type of event being handled.
        The Responsibilities of each committee shall be at the discretion

of the Commander, Special Operations Division.[1] The following committees shall be considered when planning for an event:

- Venue Security

- Sanitation

- Crisis Management

- Consequence Management

- Transportation

- Traffic

- Legal

- Media Relations

## IV.   UNPLANNED EVENTS

Unplanned events are ones of which the Department has no prior knowledge.  Such events may consist of spontaneous gatherings and/or large-scale demonstrations.  Unplanned events are often peaceful and pose little problem for law enforcement; however, peaceful gatherings can turn violent, so contingency plans must be in place for members to respond as necessary to safeguard life and property.

**Response to Un-permitted First Amendment Assemblies**

The first officer(s) to arrive on the scene of a First Amendment Assembly is responsible for the following actions:

1.   Observe the situation to determine if the gathering is peaceful or has the potential to turn violent.

2.   Notify the CIC and the Office of Unified Communications (OUC) of the nature and size of the assembly and request the assistance of a supervisor.

---

[1] The Commander of the Special Operations Division will serve as a liaison officer to city, federal and other           law enforcement agencies in the manner set forth in GO-RAR-310.04 *Mutual Aid Agreements.*

3.      Attempt to identify and make contact with the group organizers or leaders to determine the duration of the event, the number of persons expected to attend and if civil disobedience is anticipated or planned.

4.      If criminal activity has occurred, attempt to identify those individuals who were involved.

In large gatherings the SOD Commander or on-duty SOD Official shall be requested to respond to the scene.  If an SOD Official is unavailable, the District Watch Commander shall respond to the scene and assume command of the demonstration as the Incident Commander (IC).  However, Incident Commander Responsibilities outlined below apply regardless of rank and should be implemented as soon as possible.

**Incident Commander Responsibilities**

The primary responsibility of the IC is the rapid assembly of sufficient staffing to provide a safe environment for the gathering and ensure that disruptions to the area are minimized.  As such the IC should immediately:

1.      Assess the situation for seriousness and its potential for escalation.  If the assembly is peaceful and adequate resources are available, efforts should be made to allow for the protest action to continue, by redirecting vehicular and pedestrian traffic around the incident.

2.      Ensure that the following information about the incident is continuously provided to the dispatcher and the CIC:

- Location of disturbance.

- Number of participants.

- Activities of the participants (e.g., blocking traffic, destruction of property, etc.)

- Direction of movement of the participants.

- Ingress/egress route(s) for emergency vehicles.

3.      If a peaceful assembly escalates to a civil disturbance beyond the capacity of personnel then present to effectively handle the situation, the official in charge shall:

- ▪ Make an evaluation as to the additional manpower required to manage the situation.

- ▪ Notify the Communications Division as to the situation.

- ▪ Determine if a partial or full activation of CDU personnel will be necessary.[2]

- ▪ Determine if a recall of off-duty personnel may be necessary.[3]

- ▪ Determine the level of personal protection equipment to be utilized and the tactics employed in response.

4.     Members of the Metropolitan Police Department are reminded that the charge of "Parading without a Permit" is not an offense and shall not be used to detain anyone.

**Violent and Non-Violent Civil Disobedience**

Civil disobedience may involve groups of individuals who engage in unlawful conduct.  This conduct may be non-violent, such as blocking traffic or the entry to a building or it may be violent involving property damage or assaults on officers.  In either case, the IC has several options for dealing with the group(s) involved:

- • Issuance of formal orders to disperse using public address equipment to assure notification to all leaders and crowd members, and to maximize the legal effects of such notifications.[4]

- • Use of tactical maneuvers and other crowd management formations to promote dispersal of those acting in violation of the law through the application of force.

- • When necessary, arrests based on probable cause of those participating in violations of law.

- • Use of less-than-lethal weapons.

---

[2] **Activating Civil Disturbance Units shall be done in accordance with G.O. 805-1** *Civil Disturbance Units.*
[3] **Recall of personnel to respond to a disturbance shall be handled in accordance with G.O.  OPS-803.04** *Emergency Response Plan.*
[4] **When possible, dispersal orders shall be given using the "warning format" in Appendix D.**

## V.     VIOLENT CIVIL DISTURBANCES

Unplanned civil disturbances may arise from a number of causes such as political grievances, economic conflicts, community unrest, or in response to police action taking place in neighborhoods, or in the midst of a crowded street, park or public place.  Civil disturbance participants come from all walks of life and cover the entire political spectrum.

Whenever an unplanned First Amendment assembly arises, the first officer on the scene will serve as the initial incident commander.  That member will be responsible for conducting an assessment of the scene, notifying the CIC and the element Watch Commander of the situation and requesting assistance from the Special Operations Division.

The basic human element sparking a civil disturbance is usually the presence of a crowd.  Civil disturbances usually arise when a crowd:

1.     Gathers to air grievances on issues, and transfers its anger from the issues to the people dealing with the issues.

2.     Swells uncontrollably as curious bystanders and sympathetic onlookers join forces with the activists or protestors.

3.     Is incited to irrational action by skillful agitators.

In civil disturbances, crowds employ any number of tactics to achieve their goals. Their tactics may be unplanned or planned, non-violent or violent confrontations.

As indicated, the situations that could evolve into a violent civil disturbance are numerous and varied.  Often there will be little or no warning before the onset of violence or property damage.  In a few instances, it may be possible to predict a level of civil disorder by the nature of a pre-planned event.  However, each civil disturbance situation is unique and commanders and supervisory officials must, therefore, plan and respond according to the nature and size of the disturbance. The policies and procedures presented in this SOP are based upon the concept of operational flexibility, and it is expected that officials will exercise sound judgment and proper command and supervisory responsibility in the control of a civil disturbance.

In a violent Civil Disturbance the primary objectives of the Incident Commander will be to:

- Protect persons, including non-participants and participants alike, and property at risk.

- Disperse disorderly or threatening crowds in order to eliminate the

10

immediate risks of continued escalation and further violence.[5]

- Deploy personnel to isolate and contain the people within a crowd who
  are acting unlawfully.

- Effect the arrest based on probable cause of those individual law violators.[6]

It should be noted that if dispersal orders are to be given in a First Amendment assembly, the officer issuing the order shall do so at least once (three warnings should be given absent exigent circumstances), using an amplification device, and allow for a reasonable amount of time for the participants to disperse.

In the area outside the perimeter surrounding the disorder site, the Incident Commander will:

- Move and reroute pedestrian and vehicular traffic around the disorder area.

- Limit access to the disorder area only to those persons approved by the Incident Commander.

- Control unauthorized egress from the disorder area by participants who        are subject to arrest based on probable cause.

- Repulse attempts to assist or reinforce the incident participants from outside the area.

The Incident Commander will establish a Field Command Post at or near the location of the disorder, from which he/she will control and coordinate police tactical operations.  A staging area will also be established for all responding emergency personnel and equipment.  Deployment of the personnel and equipment into the disorder area will be at the express direction of the Incident Commander.

### Authorization of Personal Protective Clothing

---

[5] **General orders to disperse a First Amendment assembly shall not be given unless a significant number of the participants fail to adhere to reasonable restrictions or a significant number of the participants are engaging in, or are about to engage in, unlawful disorderly conduct or violence towards persons or property.  Dispersal orders may also be given when a public-safety emergency has been declared by the Mayor and the Chief of Police or his/her designee determines that the emergency is sufficient to require the dispersal of the assembly.**
[6] **Police lines should not be used to encircle demonstrators unless it is necessary for their protection or a decision has been made to arrest those participants that are being isolated.**

The Incident Commander shall authorize the wearing of hard personal protection equipment (such as helmets, gloves, chest protectors, shin guards. etc.) only when the donning of such equipment is consistent with the District policy on First Amendment assemblies (Appendix M) and only where there is a danger of violence.

Following any deployment of officers in personal protective clothing, the Incident Commander shall make a written report to the Chief of Police within 48 hours and that report shall be available to the public on request.

**Mobilization of Personnel**

Upon being informed of a civil disturbance and the need for the mobilization of personnel, the Chief of Police or his/her designee shall review and evaluate all information pertaining to the civil disorder and make a determination as to which level of mobilization shall be implemented  (adhering to the guidelines of *G.O.-OPS 803.04* (*Emergency Response Plan*)).

Upon being notified that the Department has implemented one of the mobilization levels, each Assistant Chief of Police and Senior Executive Director shall ensure that all officials under his/her command are notified and carry out their duties and responsibilities as required.

The Metropolitan Police Department is the primary law enforcement authority during an unlawful assembly or riot situation in the District of Columbia. Assistance may be obtained from other city departments and from law enforcement mutual aid and military assistance agreements as necessary.[7]

**Providing Security for D.C. Fire/EMS and Other Responders**

The Incident Commander shall ensure that all necessary police security will be provided to D.C. Fire and Emergency Medical Services Department personnel, as well as to other medical and public utility responders, to ensure their safety within the disorder area while performing emergency tasks.

---

[7] **Note: these procedures deal with spontaneous occurrences, not planned events where police control   forces and command structure are already in place; however, these policies and procedures are          applicable to a planned event which degenerates into an unlawful assembly or riot.**

## VI.   ORGANIZATION OF CIVIL DISTURBANCE UNITS

The organizational structure of the Civil Disturbance Units (CDU) is designed to facilitate command, control and communication.  Additionally, the structure allows for authority and accountability.  In compliance with the National Incident Management System (NIMS), the Civil Disturbance Platoons[8] will be organized as follows:

- **CDU Squad:**                       Seven officers commanded by one Sergeant

- **CDU Platoon:**                    Four squads commanded by one Lieutenant

- **CDU District**:                     A Number of platoons from the same patrol district. The district's staffing levels determine the total number of platoons required.

- **District CDU Commander:**   The Captain in command of all CDU Platoons from one district.

The Patrol Districts shall maintain a total of twenty-eight (28) CDU Platoons. Additional CDU platoons shall be maintained by non-patrol units at the direction of the Chief of Police.  The platoons are assigned numerical designations based on their Patrol District and Platoon number. Each district shall maintain a certain number of platoons based on the Patrol District's staffing levels, which will be organized as follows:

- (1) Scooter/Mountain Bike Platoon

- (1) Car Platoon:

- All remaining platoons shall be denoted as foot platoons and will be provided vans or buses during deployments.

Each platoon can perform any crowd control formation currently used by the Department.

---

[8] NIMS also requires the common terminology of all police resources.  In this case MPD's CDU Platoons will be considered Mobile Field Forces (MFF).

Each platoon is designed with the same squad functions:

- 1st and 4th Squads      Base squads for crowd control formations.

- 2nd and 3rd Squads      Support squads for the platoon.

Each squad shall have two (2) grenadiers.  The CDU Captains from each District will be responsible for ensuring that all grenadiers are certified in the use of all departmental less lethal and chemical weapons.

**Total MPD CDU Staffing**

| | |
|---|---|
| Captains | 7 |
| Lieutenants | 28 |
| Sergeants | 112 |
| Officers | 784 |
| **Total:** | 921 |

**Special Operations Division Personnel**

All members of the Special Operations Division are required to be CDU certified and shall be considered operational resources during CDU activation.

## VII.   COMMAND ASSIGMENTS AND RESPONSIBILITIES

During periods in which the Department is fully mobilized for mass demonstration operations, the following command assignments and responsibilities shall be in effect:

1.   **Chief of Police:**  As the Commanding Officer of the Metropolitan Police Department, the Chief shall oversee all police activities during CDU activation.

2.   **Assistant Chief, Chief of Staff, Executive Office of the Chief of Police**: Shall assist the Chief of Police.

3.   **Assistant Chiefs**: Shall be assigned specific duties and responsibilities as designated by the Chief of Police.

4.   **Assistant Chief, Homeland Security Bureau**:  Shall have command authority over all arrangements and activities within the Homeland Security Bureau, to include the coordination and operational functions specific to the Intelligence Unit, the Special Operations Division and the Civil Disturbance Unit.

5. **Commander, Special Operations Division**: Is designated as the CDU Commander and shall coordinate, command and direct all CDU and SOD activities.  The SOD Commander will manage all traffic control activity and demonstrator activities, and shall coordinate the collection and dissemination of pertinent demonstration and/or civil disturbance-related information.

6. **Commander, Criminal Investigations Division**: Shall manage all plainclothes details and assume operational control of the JOCC and CIC operation.

7. **Director, Metropolitan Police Academy**:  Shall provide staff from the Media Productions Unit for the purpose of videotaping any situation that might later be of legitimate value to the Department.

8. **Commander, Narcotics and Special Investigations Division**: Shall be tasked with coordinating and implementing operations for prisoner processing for mass arrests.

9. **Director, Evidence Control Branch**:  Shall implement emergency property receiving procedures for processing property taken into custody during mass demonstrations and civil disturbances.  Also is responsible for coordinating and implementing the feeding of police personnel.

10. **Office of the Chief Financial Officer**:  Shall arrange for specific procurement of items and equipment required during the course of operations.

11. **General Counsel**:  Shall provide field assistance to the Chief of Police and other command personnel, and perform liaison functions with courts, the Office of the U.S. Attorney, the Office of the Attorney General, bar associations, and other legal organizations as applicable.  The General Counsel shall coordinate the implementation of court orders pertaining to the Department and responses to inquiries from judges and other members of the legal community.  All court orders and inquiries from judges shall immediately be brought to the attention of the Chief of Police and the General Counsel.

12. **Official in charge of the CIC/JOCC**:  Shall ensure that the Joint Operations Command Center (JOCC) is prepared to handle major events and ensure that video capabilities and downlink for Falcon are operational and proper staffing is on hand to record and

coordinate the movement of personnel. (**Appendix A**)

13. **<u>Outside Agency Command Posts or Emergency Operations Centers:</u>**   A number of command officials who are trained to serve as Emergency Liaison Officers (ELO) shall be used to staff the various command posts that may be established during large events (US Capitol Command Center, US Secret Service Command Center and the EMA Emergency Operations Center, etc.)

14. **Non-CDU Captains and/or Inspectors:** Shall be trained as Emergency Liaison Officers (ELO's) to operate in an Emergency Operations Center (EOC) environment.  During event planning EOC assignments shall be made from this trained cadre.

# VIII.  FULL MOBILIZATION OF PERSONNEL IN SUPPORT OF EVENTS

When a full mobilization of personnel is necessary to support large events or First Amendment assemblies the following units shall provide support as enumerated below:

**Force Investigation Team (FIT)**

The Office of Professional Responsibility has the responsibility for monitoring, assessing, and investigating allegations or instances of misconduct and/or use of force through the Force Investigation Team (FIT) of the Internal Affairs Division (IAD).  The FIT shall investigate all incidents involving the use of force arising from a First Amendment Assembly according to the procedures outlined in Appendix L.

**Specialized Equipment Support Unit (SESU)**

The Metropolitan Police Department's Specialized Equipment Support Unit (SESU) was established to assist CDU platoons and arrest teams in removing protesters from improvised locking devices.  By employing devices made from cement, steel, wood, and other materials, protesters intentionally block roadways, entrances to public/private property, and resist arrest.

SESU members are trained, certified and equipped with special extracting tools to defeat improvised locking devices used by demonstrators.  When it is apparent that demonstrators have locked themselves into improvised locking devices, the platoon commander shall notify the JOCC that the services of SESU are needed**. Medical Services Division**

The purpose of the Medical Services Division is to facilitate the health and welfare of all members by taking reasonable steps to provide medical assistance is available to them during times of large demonstrations.  Where CDU has been activated, the optional sick leave program may be suspended.  When those conditions are in place, the following procedures shall be adhered to:

All members reporting sick are required to report to the Medical Services Division for an evaluation.  During the hours when the Medical Services Division is closed, members reporting sick shall respond to the Providence Hospital emergency room for evaluation.  Members reporting for evaluation at the Medical Services Division or the hospital emergency room shall respond attired in the uniform of the day and have in their possession all necessary equipment to assume their duty assignments.

**Explosive Ordinance Unit**

Members should abide by the procedures outlined in ***GO-RAR - 309.2 (Bomb Threats and Explosive Devices), GO-RAR - 802.04 (Hazardous Material Incidents) and CIR-02-09 (Hazardous Materials Information)*** for a more detailed list of duties and responsibilities regarding suspicious packages, and unknown substances.

**D.C. Fire and Emergency Medical Services Department**

When it has been determined that a civil disturbance of major proportions is contemplated or underway, a request will be made to the District of Columbia Fire and Emergency Medical Services Department (DCFEMS) to provide the necessary units and assistance to be staged for response to medical requests.

Whenever medical treatment is required for police officers as a result of a civil disturbance, a written and photographic record shall be made of all injuries to police officers in accordance with *GO-RAR- 201.14 (Photographing Injured Police Officers)*.  When the injury is the result of an assault and an arrest has been made for an "Assault on a Police Officer," the case shall be processed in accordance with the provisions in *GO 701.3 (Handling Assaults on Police Officers)*.

**Relief and Feeding of Personnel**

Each unit commander shall be responsible for arranging a schedule of relief for personnel under his/her command.  In this regard, commanders shall arrange a location where food and facilities will be available to their personnel.  Every effort shall be made to ensure that personnel are given a period of relief as conditions allow.

The official designated in charge of the Commissary Detail shall arrange for the delivery of food and beverages to pre-determined locations at pre-determined times.  Should a subsequent feeding of personnel become necessary, and it is necessary to change the delivery locations, the official shall coordinate through the Incident Commander those locations most accessible to personnel.

## IX.   OPERATIONAL PROCEDURES FOR MASS DEMONSTRATIONS

Mass demonstrations and circumstances or events surrounding them do, on occasion, give rise to situations in which substantial numbers of persons engage in unlawful conduct jointly or simultaneously within close proximity of one another.

It is the policy of the Metropolitan Police Department to ensure that persons may enjoy free and open expression in this city with the utmost confidence that their constitutional rights will be respected.

Accordingly, it is the policy of the Metropolitan Police Department to avoid making arrests of substantial numbers of persons in response to such incidents, when arrest avoidance is reasonably possible in the interests of safety and security.

To implement these policies, this manual sets forth procedures and guidelines to be employed in policing large First Amendment assemblies (mass demonstrations).  These procedures apply in circumstances in which, by virtue of the number of persons acting jointly or simultaneously within close proximity, there exists a reasonable likelihood that MPD personnel, in accordance with the requirements of the United States Constitution, may have to:

1.   Direct those persons to cease and desist in their activities and to disperse from the location for reasons of safety and security, or

2.   Direct the arrest of such a substantial number of persons for reasons of safety and security that arrest processing of those individuals could not reasonably be anticipated to be accomplished within **four (4) hours** of the time of arrest, through routine processing measures.

**Preparation for Events that may Result in Mass Arrests**

In some cases, groups planning to engage in illegal conduct will make their intentions known in advance.  In such cases, the Department shall ensure that the necessary resources and staffing are in place to respond to such events while minimizing the disruption to routine police services.  In these cases, contingency planning for mass arrests shall include the following:

1. The Commander, Special Operations Division, shall coordinate all planning relative to the Department's preparation for responding to a mass demonstration.

2. The Department's response will be based on the best available information as to the size, purpose, and expected type of activity of those participating in the demonstration. Other essential elements of information necessary to effectively plan the Department's response are:

   ▪ Time and location of demonstration.

   ▪ Special circumstances of individuals involved (special needs, disabled, etc.).

   ▪ Estimated number of participants.

   ▪ Identity of demonstration leaders.

   ▪ Assembly areas.

   ▪ Plans and expected activities of the demonstrations.

3. Every effort shall be made to obtain the above information during advance negotiations with the leaders of the demonstration.

4. The Commander, Special Operations Division, will provide an evaluation based on information received by that division.

5. After evaluating and determining the type and level of activity to be expected during the demonstration, the Commander, Special Operations Division, will prepare a departmental action plan that sets forth particulars by which the Department will deal with a specific event. The plan shall contain provisions for the following:

   • Command assignments and responsibilities.

   • Manpower, unit structure, and deployment.

   • Liaison with demonstration leaders.

   • Liaison with external agencies.

   • Release of information to the news media.

   • Transportation and feeding of personnel.

- Traffic arrangements.

- First aid stations and ambulances.

- Re-deployment of vehicles.

- Prisoner detention areas.

- Transportation and feeding of potential arrestees.

- Reiteration of the policies regarding arrests, the use of Field Arrest Forms, and the use of force.

6.    The Commander, Special Operations Division, shall disseminate copies of the action plan to all supervisory officials and establish an Incident Command Post at or near the location of the event for the purpose of providing command, control, and coordination of the event.

7     Each CDU Commander shall be designated a specific staging area, from which the operations of the unit can be coordinated with subordinate and superior officials.

8.    CDU Commanders shall ensure that all subordinate officials and officers are wearing their badges and nameplates properly and that badge numbers and nameplates are not concealed, damaged, or tampered with, so as to interfere with the ability of the officer to be identified in compliance with G.O. 1101.1 (*Personal Appearance, Uniform and Equipment*).

Additionally, when officers are directed to don CDU protective gear, the CDU Commander (or appropriate supervisor) shall ensure that all officers have their assigned badge numbers affixed to their helmets and are reminded that officers are prohibited from removing or tampering with their badges or nameplates and are required to verbally identify themselves when asked their identities.

**Crowd Management**

a.    Where the threat of violence is expected, a minimum number of personnel shall be positioned as crowd managers.

b.      These members shall be dressed in the uniform of the day.

c.      They shall be positioned, where possible, in such arrangements that

physical contact with the assemblage can be kept to a minimum.

d.      It shall be their task to assess the mood of the crowd and to respond

to changes in crowd behavior as directed by the Incident Commander.  Accordingly, it is important that supervisors are aware of the type of crowd that is being managed; and that members are reminded at the staging site on what to expect from the participants and what types of alternative responses the members may anticipate. Absent exigent circumstances, the Incident Commander will determine the type of response deemed necessary; causing the unit to act in concert following his/her direction.

e.      Members shall not engage in demonstration-related discussion with

participants.  They shall conduct themselves so as to display an attitude of neutrality.  However, members shall be courteous and helpful, mindful that expressions of friendliness are a valuable tool in maintaining peace.  Communication is an essential tool in crowd management.  It ensures unity of action among police officers, and that police officials and crowd leaders understand one another.  It must be constant, clear, and immediate, and on many occasions, can serve to defuse threatening situations.

f.      Supervisors shall constantly observe and speak with members under their charge to ensure that they are complying with the orders of the unit commander that they are completely aware of probable responses to crowd attitude change, and that members who are showing strain are provided temporary relief.

g.      CDU Commanders shall establish communication with demonstration leaders as soon as possible, and maintain the same as a sign of cooperation, as a means of obtaining first-hand knowledge of crowd mood, and as a tool to facilitate negotiations and maintain the peace.

**Crowd Dispersal**

When the intensity level of a crowd rises and unlawful disruption, either through violent or passive means, is occurring to the extent that the Incident Commander determines there is a need to take police action, he/she will instruct the affected CDU commanders to issue warnings to the crowd to disperse.  In issuing such warnings the following procedures shall be utilized by CDU commanders. **(Appendix D)**

**Issuance of Warnings**

Whenever possible, an official deeming it necessary to issue warnings shall confer with the unit commander to explain the official's basis for believing that a warning should be issued.  The commanding officer shall make any inquiries necessary to satisfy himself or herself whether the issuance is justified and direct that the issuing official act accordingly.  This process is to be repeated as necessary during the course of the demonstration.

- The issuance of warnings shall be of such amplification and repetition that are reasonably calculated so as to be heard by the entire assemblage.

- The unit commander or that commander's designee shall issue the warnings from stationary vantage points that are observable to the crowd.

- Additional warnings, where necessary, shall be given from police vehicles, equipped with public address systems, moving around the crowd.

- The warning shall consist of an announcement citing the offenses or violations that are being committed by the participants, and a request or order, whichever is applicable, that the crowd disperse. To ensure clarity, accuracy and consistency the warning shall be issued, whenever possible, using the "MPD Dispersal Order", which is attached as Appendix D.

The entire warning process shall be documented by means of an audio-visual recording, if available.  If this is not available, then written documentation must be retained and made a part of any arrest files. **(Appendix D)**

**Verbal Persuasion**

As a first means of dispersing a crowd under static conditions, the unit commander shall attempt to verbally persuade the crowd to disperse of its own accord by announced available exit routes.

**Arrest**

An assembly of persons will not be arrested simply because the group does not possess a permit. Such an arrest may only occur after an order to disperse has been clearly communicated in a manner that is reasonably calculated to be heard by each of the persons in the group and a reasonable opportunity to disperse has been afforded, but not utilized by members of the assembly**.**

The issuing official shall recommend to the Incident Commander whether arrests should be made.  If the issuing official recommends that a mass arrest be commenced, the Incident Commander shall satisfy himself or herself that probable cause exists for the arrest of each person to be arrested.  The Incident Commander should make the inquiries reflected on the "Pre-Mass Arrest Checklist" in order to verify that a mass arrest is proper and lawful. **(Appendix E)**

The arrest of every person must be supported by probable cause.  An issuing official shall not recommend the arrest of any person unless probable cause to support the arrest of that person exists.  The Incident Commander shall not order the arrest of any person for whom he or she has not verified the existence of probable cause to arrest.

The number of warnings given, the method used, and the time intervals between warnings, shall be recorded on the commander's log.  Documentation of the procedures shall be made pictorially and audibly, if possible.  The documentation of procedures must reflect the availability and location of exit routes available to the crowd, and of any persons who leave the area.

**Commander's Event Log**

The Incident Commander and Unit Commanders (Platoon Lieutenants) shall designate one member of his/her unit to serve as the unit recorder for the purpose of entering on the Commander's Mass Demonstration Event Log all significant events associated with the operation of the unit. **(Appendix C)**  Entries into the log will be made at the direction of the unit or Incident Commander. When it becomes necessary for subordinate supervisory officials to initiate any independent action, or engage in or observe events that could be considered significant, they shall, as soon as possible, advise the unit commander for inclusion into the commander's log. Examples of events warranting entry into the log would be:

1.  Occasions requiring the use of force.  Entries shall include the circumstances, type of force used, duration, and effect.

2.  Tactical orders issued to personnel.

3.  Orders received from higher authority.

4.  Significant acts on the part of the demonstrators.

5.  Incidents involving mass arrests.

6.  Complaints alleging serious police misconduct.

7.  Issuance of warnings for mass arrests.

**Termination of *Mass Demonstrations* Details**

When conditions have subsided, the Incident Commander shall survey the affected areas and determine whether additional police personnel are still needed at a particular location.  If it is determined by the Incident Commander that no further police action is required, other than normal patrol, the detail shall be terminated.

**Accountability of Equipment**

Prior to relieving members of their command, unit commanders shall cause items of equipment that were issued by the SOD/CDU Storeroom to be accounted for and returned to that unit within the required due date and time.  This is to include coordination with the SOD/CDU Storeroom to return any rented vehicles.

District, division and platoon commanders shall prepare an After-Action Report and submit it to the Special Operations Division Commander, within five calendar days of the return to normal operations.

The After-Action Report shall contain a list of all events that occurred in chronological order to include:

- The date and time that each event occurred.

- Brief description of the event.

- Unit action(s) taken.

- Outcomes, such as number of persons arrested.

- A complete and detailed report of:

    o Problem areas encountered.

    o Highlights of significant events and unsatisfactory conditions.

    o Any recommendations for improvement.

    o Negative reports are required.

## X.    CONSEQUENCE MANAGEMENT

In the event that damage or destruction occurs within the District of Columbia, either at the hands of demonstrators or as a result of an unrelated incident, the District of Columbia Emergency Management Agency (DCEMA) will be the lead agency coordinating the city's response to incidents of man-made destruction, instances of power, water or infrastructure failure or natural disasters.  DCEMA will have rapid response teams available to respond to spilled debris, broken windows or scenes requiring emergency repairs.  DCEMA will have immediate access to the various utility companies in case they are required for emergency situations.  DCEMA will also coordinate the removal of excessive trash or other debris in areas where it may create hazards with possible demonstrator activities. Requests for the services of DCEMA can be made through the JOCC or CIC, which will coordinate with the MPD representative assigned to the DCEMA Command Post.

# APPENDICES

A.  JOC/CIC Activation and Operations…………………………...   A-1

B.  Public Information During Large Scale Events and
    Demonstrations………………………………………………   B-1

C.  Mass Demonstration Event Log………………………………..   C-1

D.  Warning Format for Mass Arrests……………………………...   D-1

E.  Pre-Mass Arrest Checklist……………………………………...   E-1

F.  Mass Arrest Procedures………………………………………...   F-1

G.  Field Arrest Forms……………………………………………...   G-1

H.  Mass Arrest Prisoner Processing and Control……………………   H-1

I.  Legal Charges for Unlawful Mass Demonstrations………………   I-1

J.  Rights Notification Forms……………………………………...   J-1

K.  CDU Use of Force……………………………………………...   K-1

L.  Internal Investigations for Use of Force and
    Misconduct…………   L-1

M.  First Amendment Assembly Provisions of the First Amendment
    Rights and Police Standards Act of 2004…………………………   M-1

N.  Records Retention……………………………………………   N-1

# Appendix A

## JOCC/CIC Operations

The JOCC/CIC/IOCC will be established in accordance with the guidelines set forth in
***GO-RAR - 803.06 (Activation and Operation of the Command Information Center).***

# Mass Demonstration First Amendment Gathering Work Flow

## First Responder



## CIC/JOCC

**Information Gathering**
- Number of persons/protestors
- Name of group
- Status of persons/protestors (i.e., Peaceful, Unruly, etc.)
- Name of reporting member
- Watch Commander and contact number of affected district.



**Command Staff** (Page Notification)
- COP/EAC Paging Group
- General Counsel
- SOD Officials
- Night Supervisor & Watch Commanders
- Intelligence

**Telephonic Notifications**
- **EMA** Notification via Telephone
- **HSOC**
- Any other affected agency

*NOTE: Pages of an urgent nature will be followed by a telephone call, accordingly.*

A-2

**Detailed Documentation in the JOCC,CIC Running Resume**
- When the incident began
- Location of the incident
- Source of information
- Notifications made
  - Names of members (and/or paging group name) notified
  - Date/Time of telephonic notifications
- Date, time JOCC is deactivated and the name of the official authorizing the deactivation.

**Quality Assurance Measures**
- CIC Watch Commander shall be responsible for all pages.
  - Paging Clarification
    - Pages shall be gleaned prior to being sent.
      - Pages shall be read back to the information provider, and
      - Shall be read aloud prior to being sent to ensure the information is accurate.
  - Urgent pages or pages of a sensitive nature shall be followed up with a telephone call to the:
    - Chief of Police
    - EAC
    - Director of Field Operations Support Division.

# APPENDIX B

Public Information Unit

1.   The Public Information Unit (PIU) is in charge of activities relating to the press and the release of information related to Mass Demonstrations and other large events.  The PIU will arrange all press conferences and organization areas for staging of the press and or news media vehicles in cooperation with the detail commanders.  In addition, the PIU will prepare press releases prior to the event informing the public of expected street closures, demonstrator activity and other non-sensitive noteworthy information likely to impact the visitors and residents of the District of Columbia.

A.   The PIU is also responsible for coordinating with public information officers from other agencies that will take part or play a role in upcoming demonstrations.  When this is necessary PIU will institute and/or become part of a Joint Information Center (JIC).  Some of the agencies that will occupy the JIC include: U.S. Secret Service, U.S. Park Police, U.S. Capitol Police, Metro Transit Authority, D.C. Fire and Emergency Medical Services Department, U.S. Bureau of Alcohol, Tobacco and Firearms, and the District of Columbia Courts. The purpose of the JIC will be to exchange information and establish protocol for the coordinated release of information.

B.   The Metropolitan Police Department (MPD) shall allow media representatives' reasonable access to all areas where a First Amendment assembly is occurring.   At a minimum, the MPD shall allow media representatives no less access than that enjoyed by members of the general public and, consistent with public safety considerations, shall allow media representatives access to promote public knowledge of the assembly.

C.   The MPD personnel located in or near an area where a First Amendment assembly is ongoing shall recognize and honor media credentials issued by or officially recognized by the MPD.

D.   The MPD shall make reasonable accommodations to allow media representatives effectively to use photographic, video, or other equipment relating to their reporting of a First Amendment assembly.

E.   Media misconduct

1.   All reports of media misconduct shall be immediately forwarded to the PIU for investigation.  This information shall include the name, press affiliation, press credential number and a synopsis of the incident as well as the necessary contact information for the member witnessing the activity.  In instances of media misconduct, the observing member shall notify an MPD Official who shall immediately report the incident to the PIU office at 727-4383.

2.   Members shall also be guided by GO-RAR - 204.01 (*Release of Information    to the News Media*).

# APPENDIX C

# P.D. 759B

# MASS DEMONSTRATION EVENT LOG

**Page intentionally left blank**

P.D. 759B 11/75

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

**COMMANDER'S MASS DEMONSTRATION EVENT LOG**

DATE

| UNIT COMMANDER | UNIT RECORDER | UNIT DESIGNATION |
|---|---|---|

| TIME | LOCATION | EVENT |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

C-3

**Page intentionally left blank**

# APPENDIX D

# WARNING FORMAT FOR MASS ARRESTS

**Page intentionally left blank**

**The below listed warning format is printed here for reference, and is to be used when preparing to make arrests in mass demonstration situations.  The information contained in any warnings that are given in mass arrest incidents must be documented and retained for reporting requirements and notifications.**

<u>WARNING</u>

*I am _____ of the Metropolitan Police*
        *(Official's name)*

*Department.  You are in violation of*

_____

                                        *(State criminal offense)*

_____

_____:

*If you do not cease your unlawful behavior and disperse peaceably you will be arrested.*

**DAY: _____DATE: _____**

**LOCATION OF ARRESTS:**

_____

**\*\*\*Record the time that all warnings have been voiced to the violators.**

**1st Warning _____ (Wait 5 minutes before reading 2nd warning)**

**2nd Warning _____ (Wait 2 minutes before reading 3rd warning)**

**3rd Warning _____ (Commence making arrests)**

*Warnings should be given with either a bullhorn or a police vehicle PA system, and they must be given in a loud and clear manner.  If possible, members of the media production unit of the MPDC will videotape the reading and arrests procedures.*

D-3

**Page intentionally left blank**

# APPENDIX E

# Pre-Mass Arrest Checklist

**Page intentionally left blank**

Has the Official recommending a mass arrest articulated justification for a mass arrest on these bases?

What actions, by the persons to be arrested, require the proposed mass arrest?
       Has anyone been injured?     Who?  What was the cause of the injury?
       Has property been damaged?   What?  What was the cause of the damage?

Will an effort to arrest likely cause more injuries than alternative police action?

Will an effort to arrest likely cause more property damage than alternative police action?

Will an effort to arrest likely cause greater disruption of traffic flow (or potentially block evacuation routes) than alternative police action?

What are the offenses committed/to be charged?

What evidence provides probable cause for the arrest upon those charges as to each person?  **<u>You must have articulable probable cause to make any arrest.</u>**

### ***<u>If the offense is incommoding, unlawful assembly and/or failure to obey a police order:</u>***

How many orders to disperse were given?

How were the orders communicated?

When was each given?

Who gave each order to disperse?

Were audio and/or video recordings made of the warnings?

Is there another way to gain control of the situation?

Is there a viable alternative to a mass arrest?

- o   Is dispersal of the crowd and arrest of a smaller number of persons as the group disperses reasonable?
- o   Is extraction of a limited number of offenders reasonable?

Has the JOCC [Joint Operations Command Center] confirmed (or have you independently determined) that there are sufficient resources available to safely make number of arrests anticipated?

- o   Prisoner Control Activated
- o   Housing Space
- o   Feeding capabilities
- o   Arresting Officers (15-1 rule)
- o   Transportation

How do other circumstances weigh in favor of or against ordering a mass arrest?

**Page intentionally left blank**

# APPENDIX E

# Pre-Mass Arrest Checklist

**Page intentionally left blank**

Has the Official recommending a mass arrest articulated justification for a mass arrest on these bases?

What actions, by the persons to be arrested, require the proposed mass arrest?

      Has anyone been injured?     Who?  What was the cause of the injury?

      Has property been damaged?   What?  What was the cause of the damage?

Will an effort to arrest likely cause more injuries than alternative police action?

Will an effort to arrest likely cause more property damage than alternative police action?

Will an effort to arrest likely cause greater disruption of traffic flow (or potentially block evacuation routes) than alternative police action?

What are the offenses committed/to be charged?

What evidence provides probable cause for the arrest upon those charges as to each person?  **You must have articulable probable cause to make any arrest.**

     ***If the offense is incommoding, unlawful assembly and/or failure to obey a police order:***

    How many orders to disperse were given?

    How were the orders communicated?

    When was each given?

    Who gave each order to disperse?

    Were audio and/or video recordings made of the warnings?

    Is there another way to gain control of the situation?

    Is there a viable alternative to a mass arrest?

- Is dispersal of the crowd and arrest of a smaller number of persons as the group disperses reasonable?
- Is extraction of a limited number of offenders reasonable?

Has the JOCC [Joint Operations Command Center] confirmed (or have you independently determined) that there are sufficient resources available to safely make number of arrests anticipated?

- Prisoner Control Activated
- Housing Space
- Feeding capabilities
- Arresting Officers (15-1 rule)
- Transportation

How do other circumstances weigh in favor of or against ordering a mass arrest?

**Page intentionally left blank**

# APPENDIX F

# Mass
# Arrest Proceedures

**Page intentionally left blank**

A.    <u>Arrests</u>

1.   <u>General:</u> Arrests during mass demonstrations and civil disturbances shall be made at the direction of the Incident Commander.  However, this policy is not meant to impede a member in fulfilling his/her responsibility to protect the public. It is his/her duty to take immediate and, if necessary, independent action when a felony offense or a crime of violence, as so designated by the D.C. Code, is being committed.

2.   <u>Pursuit:</u> Except for felony offenses, members of the force shall not pursue demonstrators into buildings for the purpose of effecting arrests unless specifically instructed to do so by an official.  Officials shall accompany and exercise close control over members under their command who go on private property or enter buildings to effect arrests.

3.   <u>Documentation:</u> During mass demonstrations and civil disturbances, every arrest will be documented consistent with the department's responsibility to protect life and property and to prevent unlawful conduct.

## P.D. 759 (Field Arrest Form)

The following outline will provide members the necessary information and techniques in completing a Field Arrest Form.

1.   The ***P.D. 759 (Field Arrest Form)*** is designed to simplify the arrest, transportation, processing, and prosecution of a person who commits an unlawful act while participating in a mass demonstration. These forms are also designed to identify and assist in the processing of property taken into police custody during a mass demonstration.

2.   The Incident Commander alone shall authorize use of the Field Arrest Form.

3.   A Field Arrest Form shall be prepared for each person arrested regardless of the specific offense. For misdemeanor charges, the PD 759 is the only form required.  For felony charges, the usual reporting forms for the offense, arrest, and prosecution are also required. Multiple charges, if any, are to be listed on the same Field Arrest Form. Any information required on the form shall be completely and legibly printed with a ballpoint pen. The following items in Section A of the Field Arrest Form shall be filled out the by the arresting officer:

1)   Date:  Insert "month, day, year" (e.g. Oct 1, 1976).

2)   Time:  Use 2400-hour system for time of arrest.

3)    Serial Number: Is pre-printed on the form.
Arresting officers shall copy this number on the back of the
Polaroid picture that shall be attached to the fourth copy of the
form.

4)    Charge:  Print the applicable charge.

5)    Location of Arrest:  Self-explanatory.

6)    Location of Offense:  Filled in only if location is other than shown
in the item titled "Location of Arrest."

7)    Brief Description of Circumstances of Arrest:
This is perhaps the most important item on the form in determining
the possibility of successful prosecution.  It is advisable, therefore,
to be as specific and detailed as time and circumstances will
permit.  For example, it is better to record "sitting in center of
intersection," rather than "sitting in street."  As much factual detail
of this nature as possible should be noted. However, it is not
necessary to repeat information contained in other items on the
form. Additionally the arresting officer shall note the name of any
federal officer or agent who questioned the arrestee, noting the
name of the federal agency, date time and location of the
questioning and whether MPD was given copies of any audiotapes,
videotapes or written versions of the questioning.

8)    Name of Suspect:  First name, middle initial, and last name of
arrested person.  (The arresting officer shall make a reasonable
effort to obtain the defendant's name, and if the defendant refuses
to provide his/her name shall indicate that in the section.).

9)    Arresting Officer, Badge No., & Unit: Self-explanatory.

10)    Court Date:  Arresting officer's assigned court day

Distribution of the Field Arrest Form shall be as follows:

**Original (White Copy):**  Accompanies prisoner to detention facility; held there for use
by Prisoner Control Center.

**Second (Yellow Copy):**  Arresting officer's copy.

**Third (Pink Copy):**  Accompanies property sent to a central Property Receiving Office
or detention facility, when an arrest is made and property is involved.  In cases where an
arrest has been made and property is not involved, the pink copy shall accompany the

prisoner to the detention facility where Prisoner Control will accept and forward it to the Data Processing Division.

**Fourth (Hard Copy):**  Accompanies prisoner to detention facility.  Three (3) Polaroid photos shall be attached to this copy.  The Prisoner Control Center shall have responsibility for the final and proper disposition of this copy.

If the D.C. Superior Court puts itself in emergency session, a Field Arrest Form shall also be made for all persons who are under arrest and in custody of the department at the time the emergency procedures are put into effect.

Arrest Team Procedures

Squads of 8 officers under the supervision of a sergeant shall form an arrest team.  No member shall arrest more than **15** persons **AT ANY ONE** particular location.

When a crowd, or segment of it, has failed to comply with warnings to disperse, the unit commander shall direct arrest teams to begin making arrests, advising team members of the appropriate charge or charges.

The squad supervisor shall then designate team members to make the arrest of selected participants.

If an arrestee is seated and agrees to walk, the arresting officer or assisting officer shall lead him from the crowd to the transport vehicle.  If an arrestee is seated or lying down and refuses to walk, they shall be carried by two or more officers.

At the transport vehicle the arrestee shall be personally advised of the charges and photographed along with the designated arresting officer.

If the arrestee is not going to be questioned about matters relating to a misdemeanor offense, it is not necessary that the Miranda warning of rights be given to the arrestee at that time.  However, if a participant is charged with a felony or will be subject to questioning of a misdemeanor offense or violation, the Miranda warning of rights shall be given at the time of arrest.

The prisoner shall be searched for weapons, evidence, or contraband; a PD 759 prepared for each arrestee; three (3) Polaroid photographs taken of the arrestee and arresting officer together; and the prisoner and property turned over to the transportation officer.

Unit commanders shall ensure that a sufficient number of teams are available to handle the arrest function properly and for relief of teams that have handled a maximum number of prisoners at one location.

***Courts have become increasingly exacting in their requirements regarding mass arrest procedures.  It cannot be emphasized too strongly that all field arrest forms should be***

*filled out as accurately and completely as time and circumstance permit.  It is important that all individuals who are arrested at one location, at one time, and for similar behavior, be charged with the same violation (s), and that the description of the circumstances of arrest be expressed in the same manner.  Inconsistency in any of these items may be regarded by the court as sufficient grounds for questioning the validity of all field arrest forms originating at that time and place, and may consequently result in the release of the suspects without further adjudication.*

*It should also be remembered that when the court is in emergency session, the information contained on the field arrest form may constitute the only evidence available to the judges in deciding whether or not to hold an individual for further action.  At subsequent court appearances, additional evidence may be developed and presented, but this opportunity will be lost if the field arrest form does not provide the basis upon which to proceed.*

Transportation of Prisoners

The transporting officers shall obtain the first, third, and fourth copies of the Field Arrest Form from the arresting officer.  Transporting officers shall not accept prisoners without a properly prepared Field Arrest Form and Polaroid photographs.

Transporting officers shall accept property from arresting officers and shall ensure that the property, or the container into which the property is placed, is legibly marked with the serial number appearing on the Field Arrest Form.  In these cases the third copy of the Field Arrest Form shall accompany the property.

When all arrestees have boarded the transport vehicle, are safely seated, and the transport vehicle has commenced its travel from the arrest location to the prisoner processing center, a member of the department is to read or play a recording of the text of the "Notification of Rights" form in a manner audible to all persons in the vehicle.  Once at the prisoner processing center, as arrestees are initially removed for processing that arrestee shall be provided a copy of the form to be read.  In addition, the text of the form is to be reflected on large signs that are to be placed conspicuously throughout the processing area.  This notice shall be offered in Spanish to those persons who require or desire such notice in Spanish.

At the detention facility, the transporting officer shall deliver the prisoner along with the first, third, and fourth copies of the Field Arrest Form, all of which are handed over to the receiving officer.  These persons shall be processed in accordance with mass arrest prisoner processing control procedures (**see Appendix H**) and provided release options as applicable under the Citation Release Program or by posting bond or collateral.

Property

The customary rules of evidence remain in effect during emergency situations; the Field

Arrest Form must be prepared accurately to ensure proper presentation of the facts in court.

All articles of property taken into police custody shall be marked with the serial number that appears on the Field Arrest Form.  Markings should be in such a position as to prevent permanent damage to the property.  Articles such as clothing and jewelry shall be placed in container bags.  In these instances, each article of property need not be marked.  The serial number that appears on the Field Arrest Form shall be written on the outside of the bag.  The third (pink) copy of the Field Arrest Form must accompany the property.

When so ordered by the Chief of Police, a Property Receiving Officer shall be established and staffed by the Evidence Control Branch.  During the periods when this office is in service, all property taken into police custody as a result of activities connected with a mass demonstration or a civil disturbance shall be forwarded to the Property Division, accompanied by the third (pink) copy of the Field Arrest Form.  The Evidence Control Branch shall then be responsible for processing such property.

Property that comes into police custody, even though no arrest has been made (i.e. found or abandoned items), shall be forwarded to the Evidence Control Branch, if in operation, or otherwise to the nearest detention facility by means of a Field Arrest Form completed as accurately as possible. The recovering officer shall retain the first, second, and fourth copies. In addition, he/she shall arrange for the expeditious removal of property by the most available means.

When the Evidence Control Branch is not activated, the recovering officer shall be held responsible for the processing and proper disposition of all property coming into his/her possession until forwarded to the Evidence Control Branch per *GO-RAR-601.01 (Recording, Handling, & Disposition of Property Coming into the Custody of the Department).*

*In cases of mass seizures of property or evidence, every attempt shall be made to document the seizure and preparation of said items via videotape or photographs.* This documentation will strengthen the Department's position as to the treatment of these items to reduce the likelihood of frivolous claims of damage

**Page intentionally left blank**

# APPENDIX G

# P.D. 759

# FIELD ARREST FORM

**Page intentionally left blank**

PD 759, Rev. 9/71 METROPOLITAN POLICE DEPARTMENT – D.C.

## FIELD ARREST FORM

### SECTION A — ARRESTING OFFICER'S SECTION

| 1. DATE | 2. TIME | 3. 549401 |
|---|---|---|

4. CHARGE

5. LOCATION OF ARREST

6. LOCATION OF OFFENSE (If other than 5)

7. Brief Description of Facts & Circumstances Surrounding Arrest

8. NAME OF SUSPECT

| 9. ARRESTING OFFICER | 10. BADGE NO. | 11. UNIT | 12. COURT DAY |
|---|---|---|---|

### SECTION B — TRANSPORTATION SECTION

| 13. TRANSPORTED BY | 14. TRANSPORTED TO |
|---|---|

### SECTION C — PROCESSING SECTION

15. ADDRESS OF ARRESTEE

16. NAME IF FOUND TO BE DIFFERENT FROM ABOVE

| 17. D.O.B. | 18. WALES INQUIRY ☐ YES ☐ NO |
|---|---|

19. DISPOSITION (EF, BOND, COURT DATE, ETC.)

### SECTION D — PROPERTY SECTION

20. PROPERTY IS:

☐ PRISONER'S  ☐ EVIDENCE  ☐ ABANDONED  ☐ SUS PROCEEDS

21. OWNERSHIP IS:

☐ KNOWN  ☐ UNKNOWN  ☐ POSSIBLE OWNER

NAME:

22. BRIEF DESCRIPTION OF PROPERTY

| 23. COMPLAINANT'S NAME OR BUSINESS | PHONE NUMBER |
|---|---|

24. ADDRESS

**Page intentionally left blank**

# APPENDIX H

# Mass Arrest and Prisoner Control Procedures

**Page intentionally left blank**

# Standard Operating Procedures for Mass Arrest and Prisoner Control

The mass arrest prisoner control system involves three stages:

|            |                                      |
|------------|--------------------------------------|
| Part I:    | Arrest and transportation of prisoners |
| Part II:   | Processing of prisoners              |
| Part III:  | Housing of prisoners                 |

## I.  ARREST AND TRANSPORTATION OF PRISONERS

### A.   Mass Arrest:

1.  District personnel will handle routine arrests in the usual manner at their respective districts or at the designated alternate sites.  Prisoner control will only handle arrests due to civil disorder arising from events associated with the demonstration.  PD Form 759, Field Arrest Forms will be used for these arrests.  No prisoner will be accepted at the prisoner control processing site without a PD 759 and three clear Polaroid/digital photos of the arrestee with the arresting officer.

2.  The determination to arrest under the mass arrest system will be made by the Incident Commander.

3.  Once mass arrests have been ordered, arrest teams will move in and effect the arrests.  Arrestees will be restrained and brought to a prisoner control vehicle for transportation.  MPD shall only use such restraints in the transporting, processing, and detention of persons as the Chief of Police or his designee determines to be reasonably necessary to maintain the safety of the arrestees and of MPD arresting, transporting, and/or processing personnel, and to prevent escape.

4.  All arrestees are to be secured in accordance with MPD G.O. 502.01, *Transportation of Prisoners*.  Where flex-cuff restraints are used to secure an arrestee's hands or arms, the officer applying the flex-cuffs must always check restraint tightness.  To avoid injuries that may be caused by over-tightening the restraints, when applying the flex-cuff, the officer is to draw the strap up only until the strap comes in contact with the arrestee's skin at all points.  The officer is then to attempt to insert his or her index finger between the strap and the arrestee's wrist.  If the officer cannot readily place his or her index finger between the strap and the arrestee's wrist, the officer is to immediately remove the flex-cuff and properly apply a new flex-cuff to prevent escape but no tighter.

5. Officers are to give prompt attention to complaints that the cuffs are too tight. Even after using the precautionary measures indicated above to prevent over-tightening of flex-cuffs, if the restrained person complains that the cuffs are too tight the officers should stop (if reasonably possible) and check the tightness of the cuffs. Even if the cuffs are properly applied, the person could still have placed pressure on the cuffs or the person could have turned his or her hand within the cuff and caused constriction on part of the hand. If upon checking the cuffs the officer finds that the cuffs are too tight, the officer is to remove the flex-cuffs as soon as reasonably possible and replace them with flex-cuffs applied to fit properly. Further, if upon checking the officer finds that the flex-cuffs are at the appropriate tightness and there does not appear to be a problem, the officer need not loosen the cuffs. However, the officer should document in his/her report that upon complaint the cuffs were checked and found not to be too tight.

6. No arrestee shall be restrained by connecting his or her wrist to his or her ankle, nor shall any arrestee be restrained in any other manner that forces the person to remain in a physically painful position. Further, except for those arrested for the commission or threatened commission of a violent act toward another person, or the destruction or threatened destruction of property, <u>members shall only use handcuffs, plastic cuffs, or other physical restraints on persons arrested</u> in connection with a First Amendment assembly and held in any police processing center <u>to the extent reasonably necessary, and in a manner reasonably necessary, for the safety of officers and arrestees.</u>

B. **Arrest Procedures:**

1. When mass arrests have been ordered, arrest teams will move in and effect the arrest. Arrestees will be brought to the Prisoner Control Bus where they will be thoroughly searched for weapons and contraband by the Prisoner Control transportation personnel before being placed on the bus.

   a) Each arresting officer will be responsible for arresting and processing no more then fifteen (15) arrestees per site.

   b) The arresting officers will leave the scene with their arrestees. They will respond to the prisoner-processing site and complete the PD 759, Field Arrest Forms (a PD 759 must be completed for each arrestee). Arresting officers will be advised if they need to go to court or report back to their field (CDU) assignment. ***Arresting officers can ride on the transport vehicles if space is available. Otherwise they must provide their own transportation to prisoner processing sites.***

H-4

C.      **Transportation of Prisoners:**

1.  All transport vehicles will be staged during the detail at locations to be determined by the event commander, in coordination with the transportation shift commanders.

2.  The transportation shift commander shall insure the following procedures are followed:
    - Prisoners are thoroughly searched for weapons and contraband by the Prisoner Control transportation personnel before being placed in the vehicle.
    - Adults and juveniles are transported separately.
    - Each arresting officer is responsible for arresting and processing up to fifteen (15) arrestees per site or arrest.
    - Arresting officers accompany their arrestees to the designated processing sites.
    - Each bus can have up to forty-five (45) arrestees, one (1) arresting officer for each fifteen (15) arrestees, and two (2) Prisoner Control officers.
    - Three (3) photographs of the arresting officer with the prisoner will be taken either prior to loading the prisoner on the bus unless the Incident Commander determines that circumstances require that arrestees be transferred prior to being photographed with their arresting officers in order to protect the safety of the arrestees, police officers, and/or others.  This requirement that three photographs be taken prior to transport will ensure that arresting officers will be properly identified to their arrestees and will be able to participate appropriately in any prosecution function that may follow from the arrest even if automated booking processing is interrupted for any reason.  In the case of a fully automated booking process, additional digital photographs will be taken at the processing sites.
    - The PD 759 is completed and the corresponding Field Arrest Form number is written on the reverse of all photos.  The photos will then be stapled to the Field Arrest Form and turned over to the site supervisor.  Fully automated Field Arrest Forms will have a digital photo.
    - A van sheet is completed for each arrest location and forwarded to the processing site with the transportation vehicle.
    - The transportation supervisor will direct arrested persons to the processing sites according to the pre-set priorities designated for both felonies/U.S. Cases and Office of the Attorney General charges.
    - When all arrestees have boarded the transport vehicle, are safely seated and the transport vehicle has commenced its travel from the

H-5

arrest location to the prisoner processing center, a member of the department is to read or play a recording of the text of the "Notification of Rights" form in a manner audible to all persons in the vehicle.  Once at the prisoner processing center, each arrestee shall be provided a copy of the form to read.  In addition, the text of the form is to be reflected on large signs that are to be placed conspicuously throughout the processing area.

- Additionally, notice shall be offered in other languages as is reasonable to ensure meaningful access to the notice for persons who are limited English proficient.

**PROCESSING OF PRISONERS**

The MPD shall, as expeditiously as possible, process any person arrested in a Mass Arrest to determine whether the person is eligible for release pursuant to a lawful release option and shall promptly release any person so eligible who opts for the release.  The MPD shall also promptly release any person arrested in a Mass Arrest, who, it is subsequently determined, should not be charged with any offense.

No routine computer upgrades are to be scheduled for or performed on days on which mass arrest prisoner processing is ongoing or anticipated.  Where automated prisoner processing cannot be accomplished without performance of repairs or a remedial upgrade, the Prisoner Processing Center(s) shall switch to manual backup processing procedures to accomplish prisoner processing.

**Manual backup procedures for processing arrestees shall be available on days for which a plan for processing persons arrested in a mass arrest is in effect.**  The Prisoner Control Center shall switch to manual backup processing procedures not later than fifteen (15) minutes after an information system goes off-line, irrespective of any time estimate for restoration of the information system.

A. **Processing Procedures:**
1. **Escort Positions** – Members assigned to escort positions shall:
   - Remove arrestees from the transport vehicles, upon their arrival at the processing sites.
   - Thoroughly search each prisoner for weapons and contraband prior to entering the processing facility.
   - Upon completion of stations one through four, escort prisoners to the appropriate detention area and turn them over to personnel assigned to jailer positions.

2. **Login Station** – Members assigned to the Login Station shall:
   - Write each prisoner's name, PD 759 number, charge, race, gender and location of arrest into the manual intake log.

- Complete an Arrestee Information Form for each prisoner. Members completing the form shall insure that each section is completed.
- Check each PD 759 for completeness, accuracy and legibility.
- After completion, the PD 759, the Arrestee Information Form and a Polaroid photograph shall be attached together to create an Arrestee Data Package.
- Forward the package to the Data Entry Station.

3.  **Photograph Station** – Members assigned to the Photograph Position shall:
    - During automated processing, follow instructions on digital camera operation:

**STEP # 1   COMPUTER:**
Click on the ICON   Canon Zoom Browser…

**Next Window:**
Click on EDIT.  On the drop down menu, click on Remote Capture.

**Next Window:**
Shows   CONNECT TO CAMERA

**STEP # 2 CAMERA:**
Turn on the camera

**STEP # 3 COMPUTER:**
A window will appear titled PowerShot A10 event.  Click on OK.

**Next Window:**
Click on Cancel.

**CONNECT TO CAMERA Window** will appear again, click on

CONNECT.
A window SAVE REMOTECAPTURE will appear with another window SHOOTING REMOTECAPTURE over top of it.
Minimize the window SAVE REMOTECAPTURE.

**STEP # 4**

HAVE PRISONER AND OFFICER STAND IN THE DESIGNATED AREA.

**COMPUTER & CAMERA:**

H-7

**Click** on TEST RELEASE.  You will see what your picture will look like.

If you need a close-up picture, click on the **ZOOM** lever and move it upward to the desired position.  Click on TEST RELEASE again.  **THIS IS NOT THE FINAL PHOTOGRAPH.**  This is just to see if this is the photo you want.  The final photo will be taken when you click on the RELEASE box in the lower right hand corner of the window.  When the photo is taken a flash will occur for the TEST RELEASE and the final RELEASE.

**STEP # 5**

**COMPUTER:**   After the final release photo is taken it will appear in the MASS PHOTO ARREST LIBRARY.  Double click on the photo it will be enlarged.  Click on SAVE AS at the bottom of the photo.  A window will appear in the upper left hand corner, click on the triangle in the window marked with the current date.  On the drop down menu, click Mass_01**.**  In the next window click on the file labeled **Mass Arrest.**  In the next window click on the file labeled **Mass Arrest Photo.**  In the next window where it says file name, you will type in the Field Arrest Form number (6 digit number), then click on **SAVE.**  Close the top windows until you see the window **Shooting Remote Capture** and repeat the process again for the next prisoner.

**NOTE:  If there is a lull to the point where the camera automatically disconnects, you must close all the windows and start again with the CANON ZOOMBROWS… to reconnect the camera following the same procedures as above.**

- Take three (3) Polaroid or one (1) digital photo(s) of each arrestee with the arresting officer.
- Securely attach the Polaroid photograph(s) to the PD 759 and Intake sheet.

6. **CJIS Intake Station** – Members assigned to the CJIS Intake Position shall:
   - Interview each prisoner to obtain the information required for processing and list the names in the Prisoner Control CJIS Intake Terminal.  **Do not question the prisoner about his or her actions related to the arrest.**

7. **Property Station** – Members assigned to the Property Station shall:
   - Take all prisoners' property, including money, belts and shoestrings.  Place property in a PD 14 (Property Envelope)

H-8

and record it in the PD 82 (Property Book).  Give the arrestee a PD 58 (Property Receipt).  The following exceptions shall apply:

   i.  Prisoners electing to forfeit collateral or pay a bond shall be allowed to keep money and a photo ID.

   ii.  Prisoners wishing to be interviewed for citation release shall be allowed to keep a photo ID.

- Property belonging to persons released at processing sites (i.e., Elect to Forfeit or Citation Release) will be returned to them upon their release.
- Require prisoners to inspect the property and sign the property book, indicating receipt (returning) of their property.
- Property belonging to persons requiring court presentment will be housed at the Evidence Control Branch.  Property will be separated into three categories, depending on the arrestee's intended disposition:

    **Elect to Forfeit** - arrestee is paying a fine

    **Citation Release** - arrestee is being released and will attend court on a predetermined date

    **Court Presentment** - arrestee is being held in custody and will be presented on the next date court is in session

***UPON COMPLETION OF STATIONS ONE THROUGH FOUR, ARRESTEES WILL BE ESCORTED TO THE APPRORIATE DENTENTION AREA AND TURNED OVER TO MEMBERS ASSIGNED TO THE JAILER POSITIONS***

8. **Data Entry Station (Automated Processing Only) –** Members assigned to the Date Entry Station shall:

- Receive an arrestee data package from the Intake Section for each arrestee.  The package shall contain (1) copy of the Arrestee Information Form, at least (1) Polaroid Photograph and (1) PD 759.
- Enter all data from the information form into the computerized format.  Members assigned to the Data Entry Section shall insure that each section of the electronic form is completed.
- Forward the entire arrestee data package to the CJIS Booking Station.

9. **CJIS Booking Station** – Members assigned to the CJIS Booking Station shall:

- Receive an arrestee data package from the Data Entry Station.

H-9

- Complete a manual booking sheet for each prisoner and enter the information into the Mass Arrest Booking Program in CJIS.

- Initially book everyone, as a lock-up until the processing is complete.  A CJIS trained person will then update the dispositions.
- After the defendant is processed and released, update the defendant's disposition into CJIS utilizing the completed arrest paperwork.
- Go into disposition update and enter "F" for forfeit collateral, "C" for citation release and or "B" for bond.
- For Forfeiting Collateral, enter the charge amount into the appropriate space along with the collateral receipt number and the district number.  For mass arrests, the district will be number 8.  If a date appears in the court date field, you must delete it.
- For Citation to Appear, call Pre-Trial Services via telephone on (202) 585-7030.  Pre-Trial Services updates the citation to appear cases only.  If this information is not given to Pre-Trial Services, then the CJIS system and paperwork will not match.  As a result, defendants will be placed on the lock-up list when they should not be; this will cause a mix-up.  It is imperative that the system and paperwork match.  They will require the following information:
    1. **Defendant's name;**
    2. **Date of birth;**
    3. **Arrest number; and**
    4. **Citation date given to defendant.**
- For bond cases, enter the charge amount into the appropriate space along with the collateral receipt number and the district number.  For mass arrests, the district will be number 8.  The court date must be filled in.  When issuing a bond date, the defendant is given the next available court date.  Court is in session for bond cases Tuesday thru Friday.
- Any additional information that a CJIS user needs can be obtained from the CJIS Mass Arrest Booking Procedures Manual.
- Forward the Arrestee Data Package to the WALES/NCIC Station.

**CJIS Fall Back Procedures (when CJIS is down) -** When CJIS is down, members assigned to the CJIS Station shall:
- Obtain the last arrest number utilized from the Special Operations Division.

H-10

- Utilize the Arrest Number Control Log maintained at each processing site.
- Enter the date, time and system arrest number obtained from SOD in the corresponding spaces located on the control log.
- For each arrest, enter the next sequential arrest number and the arrestee's name in the spaces provided.  Any additional information shall be entered in the comments section on the form.
- During the time that CJIS is down, a photocopy of the PD 759 completed for each arrest shall be made and retained with the log.  When CJIS returns to service, these copies will be used to enter the arrest data for all arrest numbers issued during the time the system was down.  Once the arrest has been entered into CJIS, the copy of the PD 759 should be retained in a file for thirty days.

10. **WALES/NCIC Checks Station** – Members assigned to the WALES/NCIC Station shall:
    - Receive an Arrestee Data Package from the CJIS Station.
    - Complete a WALES/NCIC check for all prisoners processed at the mass arrest processing sites.
    - Forward the Arrestee Data Package to the Master Control Station.

11. **Master Control Station– In Automated Processing,** Members assigned to the Master Control Station shall:
    - Receive an Arrestee Data Package on each arrestee from the WALES/NCIC Station.
    - Write the narrative of the computer generated PD 759.
    - Add the arrest number from CJIS.
    - Insure that a WALES/NCIC check has been performed.
    - Coordinate the printing of the computer generated PD 759, Digital Photograph and Citation Paperwork.
    - Forward all completed paperwork to a member at the Jailer positions.

12. **Fingerprint Station** – Members assigned to the Fingerprint Station shall:
    - Insure that all prisoners have their thumbprint imprinted on the Field Arrest Form, Citation Release Forms and the PD 163 when required.
    - A full set of prints will be obtained only from all prisoners without valid identification, for all felonies, and for U. S. or Office of the Attorney General charges requiring the arrested person to appear before the Court.

**B.**     **Detention of Prisoners:**

In processing sites containing cells prisoners will be detained in the cells separated by gender.  If a sufficient number of cells exist, prisoners will also be separated by the listed categories.

The use of unsecured processing sites shall be avoided unless exigent circumstances exist.  All available holding cells at mass processing sites shall be filled to capacity prior to moving prisoners to an unsecured facility.  If unsecured processing sites (not containing cells) must be used, the following procedures shall be followed:

> a) **Jailer Position**- Members assigned to the Jailer Position shall:
> - Separate prisoners into appropriate categories:
>     **Elect to Forfeit**
>     **Citation Release**
>     **Court Presentment**
> - Insure that all arrestees are placed in the appropriate holding facility (area), pending release or transportation to court.
> - Only non-violent cooperative prisoners shall be housed in open areas without cells.
> - At the Metropolitan Police Academy, classrooms may be used provided that the windows are secured and a minimum of (2) police officers are posted both at the door of the room and outside of the building at a point where windows can be monitored.
> - The classrooms shall be free of all furniture and mats shall be placed on the floor.
> - Attempt to make the arrestee as comfortable as possible, but insure that adequate security measures are utilized.
> - Maintain constant visual contact with all prisoners during times of their incarceration.
> - Coordinate the release of citation and elect to forfeit cases with members assigned to the escort positions.

**C.**     **Release of Prisoners:**

> Prisoners with valid (photo) identification that meet the established criteria will be eligible for citation release.  Those with valid (photo) identification who elect to forfeit collateral will be released after processing.  Prisoners without valid (photo) identification, those not eligible for citation release or unable/unwilling to pay a fine and elect to forfeit will have their paperwork processed through AFIS and will be

transported to the Marshal's Cellblock (either Superior Court or U.S. District Court) for arraignment.

An official shall document and explain in writing any instance in which a person arrested in connection with a First Amendment assembly who opts for release pursuant to a lawful release option or who is not charged with any offense is not released within four (4) hours from the time of arrest.

1.   **Citation Release Station -** Citation is given to defendants who elect not to spend the night in jail or pay the fine for their violation but must see a judge at a later date and time.  There will be several dates provided from Pre-Trial Services.  Under normal circumstances, there will be only twenty (20) defendants assigned to each available citation date.  Pretrial Services may increase the number of defendants eligible for citations on a given date.

**Members assigned to the Citation Release Station shall:**

- Complete form CD-2063 "Citation to Appear in Court."  The citation form is to be completed in the following manner:
- Arrest Book No.:  Write the arrest number clearly.
- PDID No. or DOB:  Write the date of birth.
- Officer, Badge, Unit:  Write the arresting officer's name, badge number and unit of assignment.
- To:  Write the defendant's name, make sure that the first, middle and last name appears this way.
- The charge line: Write the charge/charges on this line.  If there is a NOI issued, place the NOI number on the line also.
- Date:  Place the defendant's court date on the line indicated.
- Mark Box:  The first box should be marked to indicate the time and location for which the defendant is to appear in court.
- Signature: The defendant must sign and date the form where indicated. If the defendant refuses to sign the citation form, they will be denied participation in the citation program.  (This is to be explained to the defendant.)
- Have an assigned station clerk, or member the rank of lieutenant or above, sign his or her name and place his or her badge number and unit assigned where indicated.

Explain the following requirements of the program to the defendant:

- **Citation is given to a defendant who qualifies.**
- **It is a promise to appear in court at a later date and time.**

H-13

- **When a defendant does not appear in court as promised a warrant will be issued for his or her arrest.**
- **It is important to be on time, because failure to appear on time could also result in a warrant being issued for his/her arrest.**
- **After the defendant is thumb printed, the defendant is issued the pink copy of the citation form and released.**

2. **Elect to Forfeit Collateral Station –** Defendants charged with offenses that can be adjudicated through the payment of a fine may elect to forfeit collateral in lieu of requesting citation release or a court date.  Members assigned to the collateral station shall:
   - Verify that the offense with which the defendant is charged is a collateral/bond offense.
   - Consult a current collateral list to ascertain the correct amount for the charge.
   
   Complete a PD 67 (Collateral Receipt) in the following manner:
   - District – is where the money was collected.
   - Date – the date money was collected.
   - Time posted – the time you collected the money **always use regular time not military time.**
   - Name – Write last name first, then first, middle.
   - Address – Write address for prisoner.
   - Amount posted – amount of money received for the charge.
   - Charge – the offense with which the prisoner was charged.
   - Permit # - NOT NEEDED.
   - License # - NOT NEEDED.
   - Case # - insert the arrest number.
   - Officer – insert the arresting officer's name.
   - District – insert the officer's district where he/she is assigned.
   - Book or Ticket # - insert the NOI # if applicable.
   - You always want to check forfeit collateral because that is what they are doing electing to forfeit and not stand trial.
   - Date & Time – NOT NEEDED for electing to forfeit.
   - Deposited by – name of person paying prisoner's fine. (i.e., self, if prisoner paid own fine; Mary Jane – if Mary Jane paid prisoner out)
   - Station Clerk – name of person collecting money.  **If signature is not readable PLEASE PRINT.**

   ALL WRITEN RECEIPTS MUST BE LEGIBLE.

3. **Bond Cases**– (Bond must be written **BOLDLY** across the top of collateral receipt).  Defendants charged with offenses that can be adjudicated through the payment of a fine may elect to pay a bond

and appear in court on a specified date.  Prisoners that do not wish to forfeit collateral, and do not wish to remain in custody while waiting their court date may pay a bond.

For bond cases all steps are the same except:

- You would <u>NOT</u> check the elect to forfeit collateral box. Instead you would check the "Stand Trial" box.  This is because the prisoner wishes to appear in front of a judge.  The prisoner is paying money <u>NOT</u> to spend the night or weekend in jail.
- Advise the prisoner that he/she is to appear in court on the next court scheduled bond date.
- Advise the prisoner that court is scheduled for bond cases Tuesdays through Fridays.  (i.e., if the prisoner is arrested on a Saturday, he/she is to appear in court on Tuesday.  If the prisoner is arrested on Wednesday, he/she is to appear in court on Thursday.  If the prisoner is arrested on Friday, he/she is to appear in court on Tuesday).
- The date and time of the prisoner's court appearance is placed in "Date and Time" section.
- The time is always 9:00 a.m.

4.  **Issuance of Collateral Receipts** –<u>Separate receipts shall be written for each charge placed against a prisoner</u> (i.e., charges of FTO, Crossing a police line and Incommoding, would require the issuance of three collateral receipts).  This still applies when one prisoner is electing to forfeit collateral for another prisoner.  Receipts shall be disseminated as follows:

- The top/original copy goes to the prisoner.
- The second copy goes with the paper work.
- The pink copy is for the records for audit purposes.

5.  **Notices of Infractions (NOI):**  When a NOI is issued for a particular charge and the prisoner is paying out/electing to forfeit:

- Copy A (original copy) is stapled to the second copy of the collateral receipt, which goes with the paperwork.
- Copy B of the NOI is for the officer's record.  It should stay with the arresting officer.
- Copy C (pink copy) should go to the prisoner along with the prisoner's copy (copy A) of the collateral receipt.
- The members receiving the elect to forfeit collateral payment must write E/F on the front of the NOI.

6.    **BOND NOIs:**
- Copy A (original copy) of NOI goes with arresting officer for papering.
- Copy B is attached to the paper work.
- Copy C (officer's copy) stays with officer for his records.
- THE PRISONER DOES NOT GET A COPY OF THE NOI IN BOND CASES.

The Commanding Officer of Prisoner Control shall put procedures in place to assure persons possessing photo identification, collateral or elect to forfeit funds for another, are permitted to provide these items to MPD personnel to facilitate the release of an arrestee

**D.**   **Arrest Paperwork:** Arrest paperwork at all sites will include:

- PD 759 Field Arrest Form  (manual or automated)
- PD 163 Prosecution Report (reverse side only)
- Polaroid/digital picture of arrestee with arresting officer
- Prisoner's Van Sheet
- CD 2063 Citation to Appear
- A generic statement of facts for the PD 759 will be generated for multiple arrests with the same charges, at the same location, and be used for all arrestees.
- A separate PD 163 will be required for individual criminal acts that are felonies such as APO, destruction of property, and USAO misdemeanor charges.
- Property envelope and receipt
- Fingerprint cards
- PD 313 for Injured Prisoners

1.    **Arrest Packets -** Each arrest packet shall contain the following:

- Original PD 759 (Field Arrest Form) completed by the arresting officer on the scene of arrest
- Two (2) Copies of the Automated PD 759 with digital photograph, printed by the master controller
- Two (2) Photocopies of the PD 759
- Citation release forms, if applicable
- Collateral receipt in elect to forfeit and bond cases.
- One (1) Polaroid photograph, (3) photographs under manual processing
- NOI, if applicable
- Copy of PD 9 (Fingerprint Card), if applicable

2.      **Paperwork Disposition** - Arrest packets shall be disseminated in the following manner:

- The originals plus one (1) Xerox copy is packaged for court liaison.
- One color copy is packaged for the U.S. Marshal's Cellblock.
- One color copy should be packaged for Records Division.
- One copy of all paperwork is to be packaged for Prisoner Control files.

3.      PD Form 237-c Transmittal – A PD 237-c shall be completed for each group of arrest packets leaving the processing center.  For each disposition there must be a separate transmittal.  At the top of each form you must indicate the disposition (i.e., elect to forfeit, citation, lockup or bond).  A completed PD 237-c shall be attached to arrest packets and forwarded as follows:

- Original court (lockup) case paperwork to Court Liaison Division
- Original bond case paperwork with a copy of the collateral receipt to Court Liaison Division
- Original elect to forfeit case paperwork with a copy of the collateral receipt to Court Liaison Division
- Original Citation case paperwork to Court Liaison Division
- Copy of all dispositions case paperwork to Records Division.

4.      **Van Sheet** - For all lock up cases, the defendant is placed on a van sheet and time stamped.  Then the defendant is transported to the cellblock along with his/her paperwork for further processing.

E.      **Feeding of Prisoners**:

The feeding of prisoners during major events requires a contractual agreement between MPD and a vendor selected by the Department's Office of Procurement.  A Purchase Notification (3-and-1 Form) must be completed and submitted through Special Services Command to the Finance and Budget Office.

The feeding of prisoners during minor events (where the limited number of participants dictates that it would not be reasonable to prepare for Mass Arrest processing) shall be coordinated with the Adult Processing Unit, Office of Corporate Support.

F.      **Transportation to Court:**

Prisoners being sent to the U.S. Marshal's Cellblock (for arraignment) will be sent in groups with consideration given to:

1.      Same arresting officer;
2.      Similar charges, (All U. S. or all Office of the Attorney General); and
3.      A van sheet must be generated and transported with each group of prisoners to the block.

**G.      Technical Support:**

The Office of the Chief Information Officer shall provide the Prisoner Control Center with on-site technical support staff during each activation to troubleshoot and minimize unanticipated information/computer systems downtime that would delay prisoner processing.

Contacts: Program Manager-Information Technology, phone: (202) 727-7332 or the Technical Assistant, phone: (202) 727-4670.

The Records Department, Manager (202-727-2228) or the CJIS Coordinator (202-727-8583) should be notified prior to Mass Arrest demonstrations to ensure that the CJIS Mass Arrest User ID's have been re-set and are ready for use.

**H.      Monitoring:**

The Civil Rights and Force Investigations Section, Office of Professional Responsibility, shall periodically monitor all prisoner-processing facilities to ensure that prisoners are being processed, restrained and transported consistent with law and Department policy.

**I.      Uniform and Equipment:**

Prisoner control personnel will wear the Class B uniform.  Utilities and jumpsuits are not authorized.  Recruit and/or Lateral Entry officers will wear their issued uniforms.
1.  All processing personnel will be equipped with all issued CDU protective gear and chemical protective gear.
2.  Transportation vehicles will be equipped with field processing kits and cameras and will assist Special Operations Division and Civil Disturbance Unit arrest teams related to the event.

**J.      Communications:**

1.  The processing centers, all transportation supervisors and vehicles will monitor the radio channel designated by Special Operations Division for exclusive operations for the event.

H-18

**K.**   **Arrest:**

1.   All arrests associated with mass demonstrations, except for serious felonies (i.e., shootings, stabbings, robberies, etc), will be processed at the prisoner processing centers.
2.   All eligible prisoners that possess valid identification and wish to post collateral will be thumb-printed and released from the processing site.
3.   All prisoners arrested for Office of the Attorney General charges that possess valid identification and meet the qualifications for Citation Release will be thumb-printed and released from the processing site.
4.   A full set of fingerprints will be obtained from all other arrestees associated with the demonstration.

**L.**   **Injured Prisoners:**

1.   Prisoner control transportation personnel will take custody of injured prisoners and arrange for transportation and security during treatment.
2.   Prisoner control personnel will accompany the arrestee to the hospital and stay with him/her until treated and then transported to Prisoner Control for processing.
3.   Serious injuries noted on the scene of the arrest will be taken directly to the nearest hospital.
4.   On-site medical personnel will initially evaluate injuries noted at the processing centers.

## III. PRISONER PROCESSING/HOLDING SITES:

A.   The following locations may be considered when determining processing sites:

1.   **The Metropolitan Police Academy (Gymnasium)** – located at 4665 Blue Plains Drive S.W.  This facility can be used to process and house cooperating demonstrators, persons charged with mass arrest offenses, who are eligible for Citation Release, or those who pay a fine and elect to forfeit.  This facility will have the maximum capacity to house four hundred (400) cooperating demonstrators.

2.   **Cell Block "B"** – located at Fourth and F Streets N.W., in the basement of the old Superior Court building.  This facility can be utilized to process and house both cooperative and uncooperative/violent demonstrators.  This facility will have the maximum capacity to house four hundred (400) prisoners.  **Note:**

A letter to the Chief Judge of the D.C. Superior Court is required to obtain permission to utilize this facility.

3. **Central Cellblock** – located in the basement of 300 Indiana Ave., N.W.  This facility can be utilized to process and house both cooperative and uncooperative/violent prisoners.  This facility will have the capacity to house one hundred forty (140) prisoners.

4. **501 New York Avenue, Northwest** - This facility can be used to process and house uncooperative and violent demonstrators. This facility has the capacity to house 32 prisoners.

5. **First District**- located at 101 M Street, S.W.  The Commanding Officer of Youth Investigations Branch will make arrangements to process JUVENILES at the First District during the duration of the detail.  The First District Cell Block can house up to thirty (30) juveniles.  It is anticipated that most, if not all, juveniles will be handled as contacts and released to a parent, guardian, or other responsible adult.

6. **RFK STADIUM** - located at 2400 East Capital Street, Southeast. The Band and Cheerleader rooms can be utilized for the housing of non-violent cooperative prisoners.  This facility will have the capacity to house three hundred (300) prisoners.  **Note:** A letter to the Stadium Manager, DC Sports and Entertainment Commission is required to obtain permission to utilize this facility.

B.     The CJIS Coordinator must be contacted to ensure that CJIS User ID's are available for multiple or concurrent sites.

*It should be noted that when Prisoner Control has been activated for an event, there are a number of factors that determine the number of personnel that would need to be assigned for such an operation.  These factors are:*

- *The number of potential arrests that could be made.*
- *The number of prisoner processing sites.*
- *The number of hours, or tours of duty that would be required.*

*The types of duties of the personnel at each prisoner processing site would be the following:*

- *Prisoner Processing (arrest paperwork, citation, bond, etc.)*
- *Property officers*
- *Fingerprinting officers*
- *Jailers*
- *Escorts*

H-20

- *WALES/NCIC/CJIS certified users*
- **Transportation officers (These members would not be needed at each site, but would be transporting arrested subjects to each site.)**

# APPENDIX I

# ENUMERATED LEGAL CHARGES

**Page intentionally left blank**

## CRIMINAL CHARGES FOR PROTESTS AND/CIVIL DISTURBANCES

Below we have set forth the criminal charges, which are most likely to arise as a result of the expected protests in connection with the IMF/WB demonstrations. We have not attempted to discuss the charges in detail, nor have we attempted to provide a comprehensive list of all available charges. Instead, we have focused on the charges which are **most likely** to give rise to arrests, with a list of the applicable elements of the offense and a very brief discussion of circumstances in which the charge might be most appropriate. Officers on the street are encouraged to contact the U.S. Attorney's Office or the Office of the Attorney General should questions arise concerning the statute most applicable to a given situation.

Members of the Metropolitan Police Department are reminded that the charge of "Parading without a Permit" is not an arrestable offense and this charge shall not be used to detain anyone.

## STREET PROTESTS AND DISTURBANCES

**CHARGE: Disorderly Conduct**, 22 D.C. Code § 1121
**ELEMENTS OF THE CHARGE:** (1) defendant acts in a manner such as to annoy, disturb, interfere with, offend others; or (2) congregates with others on a public street and refuses to move when ordered to do so by the police; or (3) shouts or makes noise outside or inside a building, during the night, to the annoyance or disturbance of a considerable number of persons; or (4) interferes with any person in any place by jostling against the person or unnecessarily crowding the person, or by placing a hand in the proximity of such person's handbag or purse; or (5) causes a disturbance in any public transportation conveyance, by running through it, climbing through windows or on top of seats, or otherwise annoying passengers or employees.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Someone is on a metro train, bus, or in a public street being unusually noisy (remember, this is a demonstration) or troublesome, and has been ordered specifically, and more than once, by police to move on, and refuses to do so. This offense generally applies to a breach of peace.

**CHARGE: Unlawful Assembly**, 22 D.C. Code § 1107
**ELEMENTS OF THE CHARGE:** (1) person(s) may not congregate and assemble in any street, road, highway, in and around any public building or enclosure, or any park, or at the entrance to a private building or enclosure; and (2) engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments to persons passing by, or in their hearing; or (3) to crowd, obstruct, or incommode the free use of any street, road, highway, or the free entrance to any private or public building or enclosure.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Someone is in an area outside the area of the granted permit, and **after being warned more than once** to move on, continues to block traffic on a city

street.  This is likely to be the most appropriate charge for "street blockades" by protesters.

**CHARGE: Crossing a police line**, 21 DCMR 2100.1-.5
**ELEMENTS OF THE CHARGE:** (1) in case of a fire, parade, explosion, or other occasion that causes people to collect on the public streets, highways, etc.; (2) a police officer establishes an area or zone considered necessary to afford a clearing for (a) the operation of firemen or policemen; (b) the passage of a parade; (c) the movement of traffic; (d) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, explosion, or other emergency; or (e) the protection of persons and property; (3) and suspect fails to comply with any necessary order or instruction of officer; or (4) enters the emergency zone or area.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Law enforcement sets up a barricade, a secured area, or attempts to prevent pedestrians from entering a particular area by setting up a police line, and someone crosses the police line or enters the secured area.  Prior to arrest, a warning should be given that the person has entered a secured area or has crossed a police line, and they should be given an opportunity to move back.  This offense generally also applies to a breach of peace.

**CHARGE: Failing to obey a police order**, 21 DCMR 2100.1-.5
**ELEMENTS OF THE CHARGE:** (1) see above
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** A police officer gives a command to an individual as relates to a traffic matter, and someone willfully fails to obey the order.

**CHARGE: Wearing Hoods or Masks**, 22 D.C. Code § 3112.3 (misdemeanor)
**ELEMENTS OF THE CHARGE:** (1) No person over 16 years of age may wear a mask/hood/any device causing any portion of the face to be hidden, concealed or covered as to conceal the identity of the wearer; and (2) enter upon or within public property of the District of Columbia, or any street, road, alley, etc., in the District of Columbia; or hold any manner of meeting or demonstration; and (3) **it can be established that the person was wearing the hood, mask, or other device with the intent** (a) to deprive any person of equal protection of the law; or (b) to, by force or threat of force, to injure, intimidate, or interfere with any person because of his exercise of any right secured by federal or District of Columbia laws, or to intimidate any person from exercising any right secured by federal or District of Columbia laws; or (c) to intimidate, threaten, abuse or harass any other person; or (d) to cause another person to fear for his personal safety, or where it is probable that reasonable persons will be put in fear for their personal safety by defendant's actions, with reckless disregard for that probability; or (e) while the wearer was engaged in conduct prohibited by civil or criminal law, with the intent of avoiding identification.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Merely wearing a mask or hood is not improper or illegal, and one cannot
be stopped/arrested/charged for wearing a hood or mask. Only if it can be demonstrated

that the person wearing the mask did so with the intent to intimidate, threaten, interfere with or deprive another person of his/her rights under the law, can/should action be taken on the part of the police.

**CHARGE: Throwing stones or other missiles**, 22 D.C. Code § 1109
**ELEMENTS OF THE CHARGE:** (1) no person(s) may throw a stone or other missile in any street, avenue, alley, road, or highway, or open space, or public square, or enclosure, **or** to throw such stone/missile from any place onto a street, avenue, etc.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Someone endangers another's safety by throwing projectiles.

**CHARGE: Kindling Bonfires**, 22 D.C. Code § 1113
**ELEMENTS OF THE CHARGE:** (1) defendant sets on fire (or causes it to be done); (2) in any street, highway, alley, open ground, or lot; (3) any combustible; (4) after sundown and before sunrise.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Someone sets anything afire in a city street or area during the nighttime.

**CHARGE:  Manufacture, transfer, use, possession, or transportation of Molotov cocktails, or other explosives for unlawful purposes**, 22 D.C. Code § 3215a (felony)
**ELEMENTS OF THE CHARGE:** (1) no person shall manufacture, transfer, use, possess, or transport a Molotov cocktail ("Molotov cocktail" means: (1) a breakable container containing flammable
liquid and having a wick or a similar device capable of being ignited), or
any other device designed to explode or produce uncontained combustion; or
(2) manufacture, transfer, use, possess, or transport any *In cases of mass seizures of property or evidence, every attempt shall be made to document the seizure and preparation of said items via videotape or photographs.* This documentation will strengthen the Department's position as to the treatment of these items to reduce the likelihood of frivolous claims of damage
device, instrument, or object designed to explode or produce uncontained combustion, with the intent that the same may be used unlawfully against any person or property.

**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Someone transports or possesses an explosive device intending to use the device unlawfully against a person or property.

**CHARGE: Rioting**, 22 D.C. Code § 1122 (b) (misdemeanor) (felony if any person suffers serious bodily damage, or property damage exceeds $5,000.)
**ELEMENTS OF THE CHARGE:** (1) there was a public disturbance in Wash., D.C. which, by tumultuous and violent conduct, or **the threat of such conduct**, created grave danger of damage or injury to property or persons; <u>and</u> (2) there was a group of 5 or more persons, including defendant, engaged in the public disturbance; <u>and</u> (3) defendant and at

least 4 other members of the group willfully engaged in the public disturbance on purpose.

**JURISDICTION:** United States Attorney's Office, Superior Court

**APPLICABILITY:** A "public disturbance" must be more than mere loud noise making or minor breaches of the peace.  It is conduct that has aroused, or is likely to arouse, public alarm or apprehension, and is usually accompanied by the use of actual force or violence against property and persons.  At the very least it must be conduct that has a clear and apparent tendency to cause force or violence to erupt and thus create a grave danger of damage or injury to property or persons.  "Grave danger" means danger actually present or threatened.  Damage or injury to property includes actual physical damage, or the taking of another's property without permission.

**CHARGE: Rioting**, 18 U.S.C. § 2101

**ELEMENTS OF THE CHARGE:**  (1) person travels in interstate or uses any facility of interstate commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, **and** intends; (2) to incite a riot; <u>or</u> (3) to organize, promote, encourage, participate in, or carry on a riot; or (4) to commit any act of violence in furtherance of a riot; or

(5) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot.

**JURISDICTION**: United States Attorney's Office: Transnational and Major Crimes Section

**APPLICABILITY**: Extremely unlikely that this federal charge will be used, unless we can establish that suspect(s) crossed state lines intending to incite an actual **riot**.  Merely crossing state lines/using any facility of interstate commerce in order to organize a demonstration is insufficient to pursue this charge**.**

**CHARGE: Threats**, 22 D.C. Code § 504 (misdemeanor)

**ELEMENTS OF THE CHARGE:** (1) Defendant uttered words heard by another person; (2) the words were such as to convey to the ordinary hearer a menace or fear of serious bodily injury or harm; and (3) defendant intended to utter the words as a threat.  (Note that it is not necessary that he intended to carry out the threat, or that the intended victim actually heard the threat.)

**JURISDICTION:** United States Attorney's Office, Superior Court

**APPLICABILITY:** Where someone threatens another, and the threat not only was intended to threaten and frighten another that he/she was in danger of serious bodily injury or harm, **but the ordinary hearer would feel so frightened**, then the suspect may be charged with threats.  Without more intimidating or threatening **behavior**, the case will be treated as a misdemeanor.

**CHARGE: Obstructing public highway**, 22 D.C. Code § 3121

**ELEMENTS OF THE CHARGE:** (1) person may not obstruct the free use of any public highway

**JURISDICTION:** Office of the Attorney General

**APPLICABILITY:** Person may not interrupt the flow of traffic on any highway.

**CHARGE: Obstructing bridges connecting D.C. and VA**, 22 D.C. Code § 1123
**ELEMENTS OF THE CHARGE:** (1) person may not
knowingly and willfully obstruct any
bridge connecting the District of Columbia and the Commonwealth of Virginia.
**JURISDICTION:** Office of the Attorney General
**APPLICABILITY:** Person may not interrupt the flow of traffic on any bridge
connecting D.C. and Virginia.

## PROPERTY DAMAGE

**CHARGE: Destruction of Property**, 22 D.C. Code § 403 (misdemeanor or felony)
**ELEMENTS OF THE CHARGE:** (1) defendant injured or destroyed, or attempted to
injure or destroy, property; (2) the property was not the defendant's; (3) defendant acted
on purpose; (4) defendant acted with the intent to destroy or injure the property, **or** with a
conscious disregard of known and substantial risks of harm that were likely to result to
the property from his actions.  (Note: if the value of the damaged property exceeds $200,
the offense is a felony; under $200 is a misdemeanor.)
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Property of value belonging to another is damaged by a specific
individual.  To charge a felony there must exist concrete evidence that the property
damaged had a value in excess of $200.

**CHARGE: Federal Destruction of Property**, 18 U.S.C. § 1361
**ELEMENTS OF THE CHARGE**: (1) Someone willfully injures (or attempts to injure)
or commits (or attempts to cause) any depredation against (a) any property of the United
States, or (b) of any department or agency thereof, or (c) any property which has been or
is being manufactured or constructed for the United States, or (d) any department or
agency thereof.  Note: if the damage or attempted damage to such property exceeds the
sum of $1,000, the punishment is a fine or imprisonment for not more than ten years, or
both; if the damage or attempted damage to such property is under $1,000, a fine or
imprisonment for not more than one year, or both.
**JURISDICTION**: United States Attorney's Office, Transnational and Major Crimes
Section
**APPLICABILITY**: We will use this charge **rarely**, and under the most serious
circumstances.  Normally, Superior Court Destruction of Property charges will be most
applicable.

**CHARGE: Defacing Public or Private Property**, 22 D.C. Code § 3112.1
(misdemeanor)
**ELEMENTS OF THE CHARGE:** (1) Defendant may not disfigure, cut, chip, cover or
rub with filth or excrement; or (2) write, mark, or print obscene or indecent figures; or (3)
write, draw, mark or paint any word, sign or figure, without the consent of the owner or
proprietor (or, in the case of public property, the person having custody or control
thereof, upon: (a) any property (public or private); building, statue, monument, office,
mass transit equipment or facility, dwelling or structure of any kind; (b) doors, windows,

steps, railings, fencing, stairs, walls, of any enclosure thereof, or any movable property.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Someone is spray-painting (or in any manner disfiguring) the Washington Monument, a subway car, the fence surrounding the IMF building, etc., or any other public or private property, without permission.

**CHARGE: Arson**, 22 D.C. Code § 401 (felony)
**ELEMENTS OF THE CHARGE:** (1) defendant burned **or attempted** to burn **a building**; (2) the building was the property, in whole or in part, of someone other than the defendant; and (3) defendant set the building on fire on purpose; and (4) defendant acted with the intent to kill or seriously injure another person; with the intent to threaten the security of anyone who lived in or occupied that building; or in conscious disregard of a known and substantial risk that his actions would endanger human life or threaten the security of anyone who lived in or occupied the building; and (5) defendant acted without mitigation.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Suspect set fire (or attempted to set fire) to a building intending to kill or injure someone. The charge is destruction of property if the object burned is a car, for example, or if we do not have proof (direct or circumstantial) that the defendant's intent was to kill or seriously injure another person.

**CHARGE: Placing explosives with intent to destroy or injure property**, 22 D.C. Code § 3105 (felony)
**ELEMENTS OF THE CHARGE:** (1) defendant places, or causes to be placed, in/on/under/against/near any building/car/monument/statue/structure, any type of explosive substance; (2) with intent to destroy or injure the same (in whole or part).
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Someone places any explosive device in a public or private area intending to destroy property.

**CHARGE: Unlawful Entry**, 22 D.C. Code § 3102 (misdemeanor)
**ELEMENTS OF THE CHARGE:** (1) defendant entered, or attempted to enter, a public or private dwelling, building, or other property, or part of same; (2) defendant did not have lawful authority; (3) the entry or attempt to enter was against the will of the lawful occupant or the person lawfully in charge of the premises; and (4) defendant's entry or attempt to enter was on purpose.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Someone enters the grounds of a private residence, or a restricted public building, and refuses to leave when ordered to do so. (Remember that to have a burglary, we must be able to prove that at the time the suspect entered the area in question, he had formulated intent to commit a separate crime (such as assault, destruction of property, theft)).

**CHARGE: Burglary**, 22 D.C. Code § 1801 (felony)
**ELEMENTS OF THE CHARGE: (1st degree):** (1) defendant entered a dwelling room of another used as a sleeping compartment; (2) at the time of the entry, any person was in

any part of that dwelling or room; and (3) at the time of the entry, defendant had the specific intent to commit a crime (such as theft, assault, etc.) (Note: if element 3 is not satisfied, the offense is unlawful entry.) (**2nd degree):** defendant entered any room, apartment, dwelling, store, bank, or other building of another; and (2) at the time of the entry, defendant had the specific intent to commit a crime (such as theft, assault, etc.) (Note: if element 3 is not satisfied, the offense is unlawful entry.)
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** We must be able to demonstrate that a suspect entered the place with the specific intent to commit a crime.  Otherwise, the correct charge is unlawful entry.

## U.S. CAPITOL, SUPREME COURT, AND FOREIGN MISSION PROTESTS

**CHARGE**:  **Unlawful conduct**, 9 D.C. Code Section 112 (a) (misdemeanor)
**ELEMENTS OF THE CHARGE**: (1) a person or group of persons, (2) carries or has readily accessible any firearm, dangerous weapon, explosive, or incendiary device; <u>or</u> (3) discharges any firearm or explosive, uses any dangerous weapon, or ignites any incendiary device, upon the United States Capitol Grounds or within any of the Capitol Buildings; <u>or</u> (4) transports by any means upon the United States Capitol Grounds or within any of the Capitol Buildings any explosive or incendiary device; <u>or</u> (5) knowingly, with force and violence, enters or remains upon the floor of either House of the Congress.
**JURISDICTION**: United States Attorney's Office, Superior Court
**APPLICABILITY**: U.S. Capitol Police bring case in which protesters violate their permits, or carry dangerous weapons on/in Capitol grounds/buildings.

**CHARGE**: **Unlawful Entry**, 9 D.C. Code Section 112 (b) (misdemeanor)
**ELEMENTS OF THE CHARGE**: (1) it is unlawful for any person or group of persons willfully and knowingly; (2) to utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings; (3) with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof; or (4) to obstruct, or to impede passage through or within, the United States Capitol Grounds or any of the Capitol Buildings; or (5) to engage in any act of physical violence upon the United States Capitol Grounds or within any of the Capitol Buildings; or (6) to parade, demonstrate, or picket within any of the Capitol Buildings.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY**: U.S. Capitol Police bring case in which protesters violate their permits, and commit what amounts to an unlawful entry (or any other crime) on U.S. Capitol Grounds.

**CHARGE: Protection of foreign officials, official guests, and internationally protected persons,** 18 U.S.C. § 112 (a) (felony)
**ELEMENTS OF THE CHARGE:** (1) Someone assaults, strikes, wounds, imprisons, or acts violently against; (2) a foreign official, official guest, or internationally protected

person; or (3) makes any other violent attack upon the person or liberty of such person; or (4) is likely to endanger his person or liberty; or (5) makes a violent attack upon his official premises, private accommodation, or means of transportation; or (6) attempts to do any of the foregoing.

**JURISDICTION:** United States Attorney's Office, Transnational and Major Crimes Section

**APPLICABILITY:** A foreign dignitary is assaulted.

**CHARGE: Protection of foreign officials, official guests, and internationally protected persons,** 18 U.S.C. § 112 (b) (misdemeanor)

**ELEMENTS OF THE CHARGE:** (1) Someone intimidates, coerces, or harasses a foreign official or an official guest or obstructs a foreign official in the performance of his duties; or (2) attempts to do the foregoing; or (3) congregates with 2 or more other persons with intent to violate any provision of this section: (a) within the United States and within 100' of any building or premises in whole or in part owned, used, or occupied for official business or for diplomatic, consular, or residential purposes by (1) a foreign government, **including such use as a mission to an international organization**; or (2) an international organization; or (3) a foreign official; or (4) an official guest.

**JURISDICTION:** United States Attorney's Office, Transnational and Major Crimes Section

**APPLICABILITY:** A foreign dignitary is threatened or harassed while performing his or her official duties.

**CHARGE: Parades or assemblages; display of flags; U.S. Capitol and grounds**, 9 D.C. Code Section 113 (misdemeanor)

**ELEMENTS OF THE CHARGE**: (1) person may not parade, stand, or move in processions or assemblages; (2) in the U.S. Capitol grounds; (3) or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement.

**JURISDICTION**: United States Attorney's Office, Superior Court

**APPLICABILITY:** U.S. Capitol police officers bring case in which protesters violate their permits.

**CHARGE**:  **Parades or assemblages; display of flags**; **Supreme Court Building and grounds**, 40 U.S.C. § 13k (misdemeanor)

**ELEMENTS OF THE CHARGE**: (1) It is unlawful to parade**,** stand, or move in processions or assemblages in the Supreme Court Building or grounds; or (2) to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement.

**JURISDICTION:** United States Attorney's Office, Superior Court

**APPLICABILITY**: Supreme Court law enforcement officers bring case in which protesters violate their permits.

**CHARGE**: **Injuries to property; Supreme Court Building and grounds**, 40 U.S.C. § 13i (misdemeanor, or felony, if amount of property damage exceeds $100)

**ELEMENTS OF THE CHARGE**: (1) it is unlawful to step or climb upon, remove, or

in any way injure; (2) any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf; (3) in the Supreme Court Building or grounds.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY**:  Supreme Court law enforcement officers bring case in which protesters violate their permits.

**CHARGE**: **Firearms or fireworks; speeches; objectionable language; Supreme Court Building and grounds**, 40 U.S.C. § 13j (misdemeanor)
**ELEMENTS OF THE CHARGE**: (1) it is unlawful to discharge any firearm, firework or explosive, set fire to any combustible; (2) make any harangue or oration; or (3) utter loud, threatening, or abusive language in the Supreme Court Building or grounds.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY**:  Supreme Court law enforcement officers bring case in which protesters violate their permits.

**CHARGE**: **Restriction of public travel; Supreme Court grounds**, 40 U.S.C. § 13g (misdemeanor)
**ELEMENTS OF THE CHARGE**: (1) Public travel in and occupancy of the Supreme Court grounds is restricted to the sidewalks and other paved surfaces.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY**: Supreme Court law enforcement officers bring case in which protesters violate their permits.

**CHARGE**: **Sale of articles; signs; solicitation; Supreme Court Building and grounds**, 40 U.S.C. § 13h (misdemeanor)
**ELEMENTS OF THE CHARGE**: (1) it is unlawful to offer or expose any article for sale in the Supreme Court Building or grounds; or (2) to display any sign, placard, or other form of advertisement therein; or (3) to solicit fares, alms, subscriptions, or contributions therein.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY**: Supreme Court law enforcement officers bring case in which protesters violate their permits.

**CHARGE: Carrying a Dangerous Weapon**, 22 D.C. Code § 3204(a) (felony)
**ELEMENTS OF THE CHARGE:** (1) defendant carried a deadly or dangerous weapon **openly or concealed** on or about his person; (2) defendant carried the weapon on purpose; (3) defendant **intended to use the object as a weapon**; (4) the weapon **could be concealed**; (5) the weapon was not being carried on land/property possessed/controlled by defendant.  (Note: a dangerous weapon is any object likely to produce death or great bodily injury by the use made of it.)
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Many objects (such as crowbars or wrenches) may be used as tools or for other useful purposes, and the law does not prohibit carrying those objects for those purposes.  We must therefore prove that defendant **intended to use the object as a deadly or dangerous weapon**.  Legitimate considerations include: the design/construction of the object; defendant's conduct prior to his arrest; and the time and place defendant was found in possession of the object.  Walking down the street during a demonstration carrying a crowbar

is not a crime.

**CHARGE: Possession of a Prohibited Weapon**, 22 D.C. Code § 3214 (a) and (b) (misdemeanor)
**ELEMENTS OF THE CHARGE:** (PPW (a): (1) defendant possessed a machine gun, sawed-off shotgun, black jack, slingshot (note: this is different than a slingshot), sand club, sandbag, switch-blade knife, metal knuckles, or silencer; and (2) such possession was knowing and intentional.  (PPW (b): (1) defendant possessed an imitation pistol, dagger, dirk, razor, stiletto, knife with blade longer than 3", or other dangerous weapon; **and** (3) at the time of the possession, defendant had the specific intent to use it unlawfully against another.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:**  Some objects may be used as tools or for other useful purposes, and the law does not prohibit carrying those objects for those purposes.  Unless specifically set forth in PPW(a) as being per se unlawful, we must in all other circumstances prove that defendant intended to use the object as a deadly or dangerous weapon.  Legitimate considerations include: the design/construction of the object; defendant's conduct prior to his arrest; and the time and place defendant was found in possession of the object.

**CHARGE: Possession of Implements of a Crime ("PIC")**, 22 D.C. Code § 3601 (misdemeanor)
**ELEMENTS OF THE CHARGE:**  (1) defendant possessed any instrument; tool; or implement for picking tools or pockets; (2) with the intent to use such instrument, tool, or implement to commit a crime.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:**  Some objects may be used as tools or for other useful purposes, and the law does not prohibit carrying those objects for those purposes.  We must prove that defendant intended to use the tool to commit a crime.  Simply possessing crowbars, tripods, concrete sleeves, axes, sledge hammers, and any other tool that arguably has a legitimate purpose is not sufficient to convict someone under this statue.

## ASSAULTIVE CRIMES

**CHARGE: Simple Assault**, 22 D.C. Code § 504 (misdemeanor)
**ELEMENTS OF THE CHARGE:** (1) defendant made an attempt or effort, with force or violence, to injure another person, **or** the defendant committed a threatening act that reasonably would create in another person a fear of immediate injury; (2) that at the time s/he made the attempt or effort to injure, **or** committed the threatening act, the defendant had the apparent ability to injure the person; and (3) the defendant committed the act voluntarily, and on purpose, and not by accident or mistake.
**JURISDICTION:** United States Attorney's Office, Superior Court
**APPLICABILITY:** Someone spits upon, hits, swings at, throws an object at, or injures in any manner, a law enforcement officer.

**CHARGE: Assault on a Police Officer**, 22 D.C. Code § 505(a) (felony)
**ELEMENTS OF THE CHARGE:** (1) complainant was a member of a police force operating in D.C.; (2) defendant assaulted, opposed, impeded, intimidated, or interfered with

the complainant; (3) complainant was engaged in the performance of his/her official duties; (4) defendant knew or had reason to know that complainant was a member of a police force; and (5) defendant did not act by mistake.

**JURISDICTION:** United States Attorney's Office, Superior Court

**APPLICABILITY:** Mere interference with a police officer generally will not be deemed sufficient to prosecute an APO. More is needed, particularly during a demonstration, where tempers may flare, and otherwise inappropriate behavior may be tolerated. If serious bodily injury is suffered by the officer, or the suspect uses a weapon against the officer and injury is sustained, an APO may be the appropriate charge. If a weapon (other than a gun) is used, and no injuries are sustained, Simple Assault and PPW(b) are probably the more appropriate charges.

**CHARGE**: **Assault on a Federal Police Officer,** 18 U.S.C. § 111

**ELEMENTS OF THE CHARGE**: (1) person forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his/her official duties. (Note: where the acts constitute only simple assault, defendant is fined or imprisoned not more than one year, or both; in all other cases, defendant is fined or imprisoned not more than three years, or both; enhanced penalty if suspect uses a deadly or dangerous weapon, or inflicts bodily injury, suspect is fined or imprisoned not more than ten years, or both).

**JURISDICTION:** United States Attorney's Office, Transnational and Major Crimes Section

**APPLICABILITY:** A federal law enforcement officer is assaulted during the course of his law enforcement responsibilities. We will use this federal charge **rarely**, and under only the most serious circumstances. Normally, the Superior Court Assault on a Police Officer charge will be the most applicable charge. See APO, above.

**CHARGE: Harming animals used in Law Enforcement,** 18 U.S.C. § 1368

**ELEMENTS OF THE CHARGE**: (1) person maliciously harms any police animal, or attempts to do so; (2) and the animal is "employed" by a federal agency (in the executive, legislative, or judicial branch) for the principal purpose of aiding in the detection of criminal activities, enforcement of laws, or apprehension of criminal offenders.

**JURISDICTION**: United States Attorney's Office, Transnational and Major Crimes Section

**APPLICABILITY**: A federal law enforcement officer's dog or horse is assaulted during the course of the officer's/animal's law enforcement responsibilities. We will use this federal charge **rarely**, and under only the most serious circumstances. Normally, the Superior Court charge of Cruelty to Animals will be the most applicable charge. See Cruelty to Animals, below.

**CHARGE: Cruelty to Animals,** 22 D.C. Code § 801 and 802 (misdemeanor)

**ELEMENTS OF THE CHARGE**: (1) person beats, tortures, mutilates, or kills any animal, or causes any animal to be beaten, tortured, killed, etc.

**JURISDICTION**: United States Attorney's Office, Superior Court

**APPLICABILITY**: A local law enforcement officer's animal is assaulted during the course of the officer's/animal's law enforcement responsibilities.

**CHARGE: Assault with a Dangerous Weapon**, 22 D.C. Code § 502 (felony)

**ELEMENTS OF THE CHARGE:** (1) the three elements of simple assault must be proved; and (2) the assault must have been committed with a dangerous weapon.  A weapon is anything that is designed to be used, **or** actually is used to attack or threaten another person. A weapon is dangerous if it is used in a manner to produce death or great bodily injury. Need not prove that defendant actually injured or even touched complainant with the weapon; pointing it in a threatening manner is sufficient, for example.

**JURISDICTION:** United States Attorney's Office, Superior Court

**APPLICABILITY:** Where person acts in a threatening manner while brandishing/using a weapon that could cause death or great bodily injury.  Not sufficient merely to be in possession of an object that could, in some circumstances, be deemed dangerous.


**CHARGE: Forgery and Uttering**, 22 D.C. Code § 22-3841 (felony)

**ELEMENTS OF THE CHARGE:** (1) person makes, draws, or utters a forged written instrument; (2) with intent to defraud or injure another.

**JURISDICTION,** United States Attorney's Office, Superior Court

**APPLICABILITY:** (1) Someone presents staff or fake law enforcement credentials; this constitutes an illegal uttering; (2) Someone presents legitimate staff or law enforcement credentials, but someone other than the legitimate holder presents them; this constitutes an illegal uttering; (3) someone presents fake tickets to an inaugural ball; this does not constitute a crime, as we cannot prove that the person knew or should have known that the tickets were fake, and we cannot show that a crime has been committed.

I-14

# Appendix J

# Rights Notification Form

**Page intentionally left blank**

Option 1 - YOU MAY ELECT TO "POST AND FORFEIT"

 If you choose to "Post and Forfeit," you will pay a certain amount of money and you will be released immediately and the charges against you will be dropped. You will never have to appear in court to answer the charges against you.  You will also never have an opportunity to appear in court to contest the charges against you.  You are required to prove your identity.  A "post and forfeit" is not an admission of guilt, and you will have no criminal record on these charges.  But you will have an <u>arrest</u> record on these charges.

If you are interested in the post and forfeit option, you will be provided with a list showing the amount you must pay depending on the charge for which you were arrested.

 Your decision to post and forfeit is final unless you (or your attorney) file a "Motion to Set Aside Forfeiture" within 90 days after forfeiture.  Such a motion is not automatically granted.  If it is granted, the charges against you will be reinstated and you will have to appear in court to answer them.

Option 2 - YOU MAY ELECT TO BE RELEASED ON CITATION ("CITE OUT")

You are eligible for citation release if you are arrested for a misdemeanor offense that does not involve domestic violence and there are no outstanding warrants for your arrest.  You are not required to post any amount of money for citation release but you are required to prove your identity.

If you elect citation release, you will be given a citation (similar to a traffic ticket), requiring you to appear in D.C. Superior Court to answer the charges against you.  Failure to appear in court in response to the citation is a criminal offense.  If you fail to appear in court on the date specified in the citation, a warrant will be issued for your arrest.

When you appear in court, the government may dismiss the charges against you or may proceed to trial.  If the government chooses to proceed to trial, you will have a right to be represented by an attorney and if you cannot afford an attorney one will be provided for you.  The government will bear the burden of proving beyond a reasonable doubt that you committed the offense with which you have been charged.  If you are convicted, you will have a criminal record in addition to your arrest record.  If you are acquitted, you will not have a criminal record but you will still have an arrest record unless you are later able to get it sealed or expunged by proving to the court that you did not commit any crime.

Option 3 - YOU MAY ELECT TO POST BOND ("POST AND TRIAL")

If you are not eligible for citation release, you may still be eligible to post bond.  If so, you may post a cash bond amount assigned to the charge, or a licensed bondsman may agree to post the bond for you in return for a 10% fee. You are required to prove your identity.  You will be provided with a list showing the amount you must post depending on the charge for which you were arrested.

You will be required to appear in D.C. Superior Court to answer the charges against you.  Failure to appear in court is a criminal offense.  If you fail to appear in court on the date specified, a warrant will be issued for your arrest.

When you appear in court, the government may dismiss the charges against you or may proceed to trial.  If the government chooses to proceed to trial, you will have a right to be represented by an attorney and if you cannot afford an attorney one will be provided for you.  The government will bear the burden of proving beyond a reasonable doubt that you committed the offense with which you have been charged.  If you are convicted, you will have a criminal record in addition to your arrest record.  If you are acquitted, you will not have a criminal record but you will still have an arrest record unless you are later able to get it sealed or expunged by proving to the court that you did not commit any crime.

# APPENDIX K

# Use of Force

**Page intentionally left blank**

# V.    USE OF FORCE

A.    Definitions

The following terms shall have the meanings designated:

1.    **Use of Force** – any physical contact used to effect, influence or persuade an individual to comply with an order from an officer.

2.    **Deadly Force** – any use of force likely to cause death or serious physical injury.

3.    **Non-Deadly Force** – any use of force that is other than that which is considered as deadly force.

4.    **Serious Use of Force** – lethal and less-than-lethal actions by MPD officers including:

   a)    All firearm discharges by an MPD officer with the exception of range and training incidents and discharges at animals;

   b)    All uses of force by an MPD officer resulting in a broken bone or an injury requiring hospitalization;

   c)    All head strikes with an impact weapon;

   d)    All uses of force by an MPD officer resulting in a loss of consciousness, or that create a substantial risk of death, serious disfigurement, disability or impairment of the functioning of any body part or organ;

   e)    All other uses of force by an MPD officer resulting in a death; and

   f)    All incidents where a person receives a bite from an MPD canine.

5.    **Use of Force Indicating Potential Criminal Conduct by an Officer** – includes, but is not limited to, all strikes, blows, kicks or other similar uses of force against a handcuffed subject.

6.    **Less-Than-Lethal Weapons** – any object or device deployed with the intent or purpose of eliminating a threat without causing death.

These include, but are not limited to, a 37 mm gas gun containing a cloth bag filled with small lead shot pellets, rubber baton rounds, batons, OC Spray, Armament System Procedures (ASP) tactical batons.

7. **Use of Force Option** – a training model/philosophy that supports the reasonable escalation and de-escalation of member-applied force in proportional response to the actions and level of resistance offered by a subject, but does not require the member to exhaust all possible responses in either escalation or de-escalation. The initial level of response is based upon the situation encountered at the scene and the actions of the subject, and should be the minimum amount of force sufficient to accomplish the mission. Such response may progress from the member's actual physical presence at the scene to the application of deadly force.

8. **Objective Reasonableness** – Reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene in light of the facts and circumstances confronting them without regard to their underlying intent or motivation.

B. CDU Use of Force Options

1. **Constructive Force:** Uniformed police presence. The presence may be in platoon formation. There is no physical contact between police and demonstrators. Officers in CDU protective gear may only be deployed where there is a danger of violence. The on-scene commander deploying officers in CDU protective gear shall provide a written report explaining his or her deployment decision and actions to the Chief of Police within 48 hours of the deployment.

2. **Physical Force:** Force involving hands-on touching, but with no deployment of tools or weapons. This may include line and wedge formations (with or without protective riot shield) that move a crowd. Arrests also fall into this category.

3. **OC Force:** The use of force involving Oleoresin Capsicum (OC), a natural inflammatory agent derived from the pepper plant, which is deployed from personal canisters or deployed from large scale canisters (MK-9 and MK-46 canisters). Significantly more stringent requirements must be met to justify dispensing OC Spray from the large canisters (MK-46) than from personal canisters (MK-9). A large canister should, generally, be deployed only upon the approval of an on-scene commander to repel a substantial

L-4

effort to breach a police line and/or to prevent significant physical injury of police personnel and/or others.

4. **Mechanical Force:** Force within this area is broken into two levels of force:
   **Level I -** The use of tools or weapons, to include riot baton, ASP,[1] riot shield
   **Level II -** Less-lethal projectiles (i.e.: sting ball munitions, 37mm rubber projectiles, 40mm launcher).

5. **Chemical Force**: The use of tools or weapons that disperse chemical irritants, such as Chemical and CS Agents (tear gas). *The term "chemical agent" refers to all forms of chemical irritants approved by the department for crowd control purposes.*

6. Chemical irritant shall not be used to disperse a First Amendment assembly unless the assembly participants or others are committing acts of public disobedience endangering public safety and security. Large-scale canisters of chemical irritant shall not be used at First Amendment assemblies unless (1) the use is approved by an on-scene commander and (2) reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects. The on-scene commander approving the use of large-scale canisters of chemical irritants shall provide a written report (which will be available to the public) explaining his or her decision and actions to the Chief of Police within 48 hours after the event.

7. **Deadly Force**:  Any use of force likely to cause death or serious physical injury, including but not limited to the use of a firearm or a strike to the head with a hard object.  Deadly force must be employed in accordance with ***GO-RAR – 901.07 (Use of Force)***

C. Use of Force Policy

The department's force continuum and reporting requirements as described in ***GO-RAR 901.07 (Use of Force)*** is applicable for crowd control incidents and any use of force incident will be investigated by the FIT.

Force as described herein is defined as the employment of physical presence contact or weapons in order to disperse or contain a crowd, effect

---

[1] ASP expandable riot baton devices are not part of the CDU force continuum (with the exception of other law enforcement agencies armed with the ASP).  ASP devices should only be used as a defensive tool if the primary riot baton has been taken or lost during a confrontation.

arrests, or protect lives and property.  Force shall only be used when other
less stringent means have not or would not be effective.  In all instances,
only the minimum amount of force, necessary to accomplishment the
mission, shall be used.  Such force shall immediately be discontinued
upon a determination by the Incident Commander

**Members may not employ unauthorized tools or weapons.[2]  Members
are specifically prohibited from discharging their firearms into
crowds.**

In managing a crowd, the policy of this Department is to use the lowest
level of force necessary to accomplish the objective.  The application of
force is confined to the force options as outlined below.   The level of
force shall be dependant upon the level of opposition encountered.

Individual command officials may independently direct the use of force
when the squad, platoon, or district under their charge is detached from
the rest of the unit and when the isolated element's safety or that of other
persons is jeopardized.  However, if conditions permit, the Incident
Commander or his/her designee shall be apprised of the situation prior to
initiating any use of force at this level of command.

The application of force by a unit or element of it shall be immediately
discontinued upon a determination by the ranking official on the scene
that the condition, which required the use of force, has been alleviated.

All authorizations, directions, and applications concerning the use of force
shall be recorded on ***PD 759B (Commander's Mass Demonstration Event
Log) (Appendix B)*** and shall be included in the unit commander's after-
action report.  Similarly, orders to discontinue the use of force shall also
be recorded.  This information shall also be communicated to the MPD
Joint Operations Command Center (JOCC), and segregated into a distinct
category prescribed in accordance with JOCC procedures.  Similarly,
orders to discontinue the use of force shall be communicated to the JOCC.

The Assistant Chief of Police, Special Services Command, shall ensure
that all use of force incidents occurring during civil disturbance incidents
are compiled, documented, and reviewed in an incident after-action report.
***Incidents involving use of force during a 1st Amendment demonstration
will be forwarded the Force Investigation Team for investigation.***

Individual members whose use of force is independent of the CDU unit,
shall be bound by department policy as is stipulated in ***GO-RAR 901.07***

---

[2] The following weapons are prohibited: shotguns, slapsticks, blackjacks, nun chukkas, saps, brass
knuckles, weighted gloves, and any unauthorized weapons.

*(Use of Force)*, and all specified reporting and notification requirements. **Nothing in the Use of Force policy prevents members from employing force reasonably necessary to protect themselves or others from physical or deadly force.**

1.    Civil Disturbance Use of Force Protocols

    a)    **Orderly Crowds or marches**

        Police presence is appropriate in this category.  Crowd activities should be monitored.  The police presence may be in platoon formation.  There should be no physical contact between police and demonstrators.

    b)    **Peaceful Civil Disobedience**

        Unlawful, non-violent, peaceful actions by protestors: Monitor crowd activities.  Depending on the scenario and degree of disruption, mass arrests can be considered.  The decision to make mass arrests shall only be commenced in consultation with the Incident Commander or his/her designee and must be based on probable cause that can be applied to all arrests.

    c)    **Non-Peaceful Civil Disobedience**

        Non-peaceful Civil Disobedience:  Utilize the Use of Force continuum and/or, to the extent reasonably possible, disperse, control or arrest only persons who have engaged in unlawful conduct, and/or conduct a mass arrest, according to stated procedures.  Only those persons that the Incident Commander has probable cause to arrest shall be arrested.  Platoon commanders shall contact the on-scene official commanding the incident regarding use of force.

D.    Use of Force Continuum During Mass Demonstrations

1.    Police Lines

    A police line can be either *Constructive or Physical* force.  A police line, which DOES NOT substantially encircle persons engaged in a First Amendment assembly, may be established.  A police line may be established at the direction of a unit commander whenever it becomes necessary to isolate an area in which large-scale unlawful activity is occurring or has the potential of occurring.  It is done to prevent damage to a specific target, such

L-7

as a building, a utility, or a business area, or for other purposes as authorized by Article VI, Section 5(a) of the Police Regulations (24 DCMR 2100).  A police line can consist of either uniformed personnel or blockade devices such as barricades, buses, ropes, or motor scooters.

The objective of a police line is to affect the movement of individuals or a crowd, to protect a group of individuals, or to accomplish the arrests of persons within a group.   A police line may not substantially encircle a First Amendment assembly except (1) where there is probable cause to arrest a significant number or percentage of the persons located in the area of the assembly for unlawful acts (other than failing to have an approved assembly plan/permit) or (2) for the safety of the First Amendment assembly participants.

Persons who reside, are employed, have a business or have business of an emergency nature in an area marked off by a police line shall not normally be barred from entering the area unless their safety would be jeopardized or their entry would interfere with police operations, and shall not be barred entry based upon their views or expression.  Persons not falling into one these categories shall be prohibited from crossing a police line into a disturbance area until such time order has been restored, and the police line has been removed.

a)    Verbal harassment directed against members on a police line shall not be cause for members to break ranks for the purpose of making an arrest or to engage in a verbal confrontation.  However, assaults in the form of thrown missiles capable of inflicting injury (i.e., Molotov cocktails, bricks, etc.), or physical attacks upon members, will not be tolerated, and unit supervisors shall make every effort to identify and have arrested those engaged in such activity.

b)    When normal vehicular and pedestrian traffic is affected within a large area of the city by the establishment of a police line, the Public Information Unit & CIC/ JOCC shall be notified so that local communications media can disseminate this information.

2.    CDU Platoon Formations

a)    Platoon formation – ***Constructive Force***
i)    To move a group of officers, on foot, from one location

to another.
ii) This formation is used to gather officers whenever they are in view of demonstrators.

    b)    Line formation – ***Constructive or Physical Force***

l.    To stop, guide or redirect forward movement or form a protective barrier for safety and/or security reasons

    i.    To move a crowd to another location.

    c)    Wedge formation – ***Physical Force***
        i)    Divides a large crowd into two (2) smaller groups.
        ii)    This can include ***Mechanical Force*** if tools or weapons are used in conjunction with the movement.

    d)    Belt Cordon – ***Physical Force***
        i)    Used to enable an arrest squad to move into a crowd to remove individual(s) for whom there is probable cause to arrest, or to remove individuals from the crowd for their own safety.
        ii)    To split a crowd to enable movement of officers and uninvolved citizens or protectees.
        iii)    This can include ***Mechanical Force*** if tools or weapons are used in conjunction with the movement.

    3.    OC Spray – ***OC Force***

    Individual "OC" dispensers shall be used as described in ***GO-RAR -901.04 (Oleoresin Capsicum (OC) Spray Dispensers).*** They shall be employed against crowds only as necessary in a defensive capacity, unless no other crowd management weapons are readily available for use and the tactical situation warrants the use of the individual dispensers against a crowd. Such defensive use against crowds shall be only upon approval by the Incident Commander or his/her designee.

    a)    Personal Size OC Spray – ***The use of the personal size OC canister is not considered a crowd control action***
        1.  Personal protection "OC"
         i)  Used to subdue a single person who is actively resisting an officer.
         ii)  Subject must be at least three (3) feet from the member and no more than five (5) to ten (10) feet away.
         iii)  Police use of force protocols are in effect. ***GO-RAR***

*901.07 (Use of Force), GO-RAR –901.04 (Oleoresin Capsicum (OD) Spray Dispensers), and GO-RAR – 901.08 (Use of Force Investigations).*

b)   MK 9 & MK-46 OC Canister – *OC Force*

   i)   Members are prohibited from using MK- 9 and MK-46 OC spray canisters to disperse crowds or others, unless the use is approved by the incident commander because it is reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects, or the crowd or others are endangering public safety or security.  Large-scale canisters should, generally, be deployed only upon the approval of an on-scene commander to repel a substantial effort to breach a police line and/or to prevent significant physical injury of police personnel and/or others.

   ii)  Are designed for crowd control purposes.

   iii) Projects a large amount of OC Spray from a fire extinguisher-like device.

   iv)  To be used to disperse a group demonstrators/protesters who creating unsafe or disruptive conditions and/or are actively resisting the police.

   v)   Can be used when lower levels of force will not cause the desired effect or injuries to officer will occur if direct physical confrontation occurs.

   vi)  Crowd must be in close proximity.

   vii) Individuals in police custody who have been affected by pepper spray shall be given an opportunity for washing and flushing the affected areas with cold water within 20 minutes of being sprayed, absent exigent circumstances.  They shall be advised, moreover, not to use creams, ointments, or bandages on affected areas, and that continual rubbing of the skin against affected clothing will cause irritation and reddening of the skin areas.  Individuals who complain of continued effects after having flushed the affected areas shall be transported to a hospital for medical treatment.

4.   Riot Baton – *Mechanical Force*

a)   The riot baton shall be used as a defensive weapon.  Care should be taken to avoid an aggressive or intimidating appearance through the inappropriate handling of the riot baton. Uses such as striking are made as a means of protection or overcoming resistance when other less forceful methods would not be effective or could result in

injury to the member, and when other means of assistance are not readily available to the member.  A strike to the head with a riot baton is considered deadly force, thus the FIT shall be responsible for conducting the force investigation.

b)    ***Mechanical Force*** with Riot batons – When holding the riot baton members shall always:
1.  Use a port arms position to move a resistive crowd from one area to another.
2.  Always use a two-hand grip.
3.  Ensure strikes are NOT made to the head or other vital areas.

5.    Chemical Munitions (CS) – ***Chemical Force***

The use of "CS" should be limited and only used when other tactical options are either unavailable or when lower level of force will not have the desired effect.  Only the Chief of Police or his designee shall authorize the use of "CS."  The aforementioned should be considered options and not the mandatory escalation.

The commander may employ the level of force necessary to stop a threat.  De-escalation shall occur when the need for force no longer occurs.

a.  Members are prohibited from using "CS" chemical to disperse crowds or others, unless the incident commander approves the use because it is reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects, or the crowd or others are endangering public safety or security.

b.  Chemical "CS" agents shall only be used as a defensive weapon for the purpose of dispersing crowds that are threatening or actively engaging in violence or to protect lives and property when the circumstances indicate that the use of chemical "CS" agents would be the most effective manner of accomplishing the objective.  Before chemical "CS" agents are employed in an defensive capacity, the official authorizing the deployment of the agent shall ensure that avenues of escape are available to the crowd.

c.  Individuals in police custody who have been affected

by chemical CS agents shall be given an opportunity for washing and flushing the affected areas with cold water within 20 minutes of being sprayed, or as soon as practicable.  They shall be advised, moreover, not to use creams, ointments, or bandages on affected areas, and that continual rubbing of the skin against affected clothing will cause irritation and reddening of the skin areas.  Individuals who complain of continued effects after having flushed the affected areas shall be transported to a hospital for medical treatment.

d. <u>Information required for documentation</u> – The authorizing official shall include the following information in reports related to the use of chemical agents:

(1) The circumstances that occasioned the use;
(2) Authorization for or notification of use, whichever is applicable;
(3) The types and, as nearly as possible, the amount of chemical agents used;
(4) The tactical results of use; and reports of ill effects, besides normal irritation,
(5) Hospitalization apparently occasioned by the effects of chemical CS agents.

6. Canines

The use of canines for crowd control during a protest is strictly prohibited.  Explosive Ordinance Detection Canines may be used to conduct sweeps.

E. Civil Disturbance Use of Force Reporting and Investigation Protocol

1. This SOP is a guideline for civil disturbance units during major demonstrations in the District of Columbia.  It should be noted that these guidelines apply not only to Metropolitan Police Officers, but also to members of outside law enforcement agencies working under agreement with this Department.

2. The Metropolitan Police Department adheres to the use-of-force policies and reporting requirements as delineated in ***GO-RAR - 901.07 (Use of Force) and GO-RAR - 901.08 (Use of Force Investigations)***.  However, during civil disturbance situations, the use-of-force reporting, documentation, and investigative processes enumerated in these directives raise practical, logistical, and

safety-related concerns.  The above-referenced General Orders shall guide members.

3.      Accordingly, the reporting, documentation, and investigative procedures set forth in Appendix L shall be employed in mass demonstrations situations.

**Page intentionally left blank**

# APPENDIX L

# Internal Investigations

# Use of Force
# &
# Misconduct

**Page intentionally left blank**

**I.       Investigations/Handling of Complaints**

Sworn members of the Metropolitan Police Department are expected to maintain the highest standards of conduct.  Members should conduct themselves properly and professionally, on or off duty.  When a member is accused of misconduct, a thorough investigation will be conducted.

Responsibilities and procedures for reporting and conducting investigations of serious misconduct (administrative and/or criminal) that may result in disciplinary action are set forth in ***GO-PER -120.23 (Serious Misconduct Investigations)***.  Responsibilities and procedures for reporting and conducting investigations of administrative or policy misconduct that may result in chain-of-command disciplinary action are set forth in ***GO-PER -120.26 (Chain-of-Command Misconduct Investigations)***.

The Office of Professional Responsibility (OPR) is responsible for monitoring, assessing, and investigating allegations or instances of use of force and/or misconduct involving members of the Metropolitan Police Department through the Internal Investigations Branch (IIB) or the Force Investigation Team (FIT) of the Internal Affairs Division.

During police operations relative to large-scale demonstrations and civil disturbance situations, the Office of Professional Responsibility will operate as follows:[9]

**A.       Investigations of Uses of Force**

1.  *Force Investigation Team*

a)     As publicized in civil disturbance situations in the United States and around the world, the possibility of police use of force in these situations is likely, to include the possibility of the use of deadly force.  Compounding the situation will not only be force used by members of the Metropolitan Police Department, but also by members of other agencies who have agreed to assist the Department.[10]

b)     The review of force during civil disturbance situations shall normally be reviewed from a tactical and training perspective.  However, in those situations where a Serious

---

[9] Members assigned to PMB and/or FIT shall not be used in a CDU capacity.
[10] This does not include federal agencies.

Use of Force occurs, a full investigation as denoted in ***GO-RAR - 901.07 (Use of Force)*** shall occur.  In these instances, FIT shall be responsible for conducting the force investigation in **<u>ALL</u>** instances where force is used during First Amendment Assembly.

c)      The opportunity to conduct an extensive force review during an incident may be hampered by civil disturbance or riot-type conditions.  In this scenario, FIT members shall attempt to gather as much information as possible to initiate the investigation.  However, it is recognized that due to safety concerns, team members may have to return to conduct more extensive reviews once the area is secure and conditions are safe.

i)      Conditions might exist in which FIT might not be able to enter a scene for several hours, or is not notified of a Serious Use of Force incident until long after its occurrence.  In this case, FIT members may have to rely on non-traditional means such as reviewing video footage, medical reports, etc.  Nonetheless, the fullest investigation possible will be conducted in relation to the safety level of the scene at the time of the incident.

ii)      During a declared Civil Disturbance Condition, Use of Force Incident Report forms (UFIR) shall be completed for Serious Use of Force incidents as per Use of Force Policy.

2.    The following requirements shall apply to FIT during mass demonstrations and civil disturbance situations:

a)      A representative from the FIT shall be assigned to the Joint Operations Command Center (JOCC) during a declared Civil Disturbance Condition.  This representative shall be responsible for coordinating force-related information to the Office of Professional Responsibility.

b)      FIT shall maintain a rapid response team to respond to Serious Use of Force incidents occurring during civil disturbance situations.  These members should have full protective gear and be prepared to respond to a scene in which civil disturbance may be occurring.

> c)    FIT will assess all force incidents, and in consultation with executive management, determine which incidents warrant a substantive FIT rapid response.
>
> d)    At the conclusion of a mass demonstration or civil disturbance, FIT will complete a Use of Force After-Action report.
>
> e)    While not engaged in investigating force activity, members of FIT will coordinate and confer with members of the MPD Intelligence Section as it relates to use-of-force information and possible high risk attacks on police officers.
>
> g)    Agents assigned to the OPR Electronic Surveillance Unit shall provide technical support for members of FIT, to include video documentation of civil disturbance electronic news reports.

**B.    Investigations of Misconduct/Complaints**

1.    Complaints of police misconduct received from citizens during mass demonstrations and periods of civil disorder shall be properly recorded and investigated in accordance with the requirements of either ***GO-PER -120.23 (Serious Misconduct Investigations) or GO-PER -120.26 (Chain-of- Command Misconduct Investigations)***.  Investigations into such complaints shall be conducted, utilizing prescribed procedures, as soon as the police operation concerning the disturbance has been concluded.

2.    If a complaint is of a nature that would subject the Department to public criticism or liability, or of a magnitude that, if substantiated, could subject the member to disciplinary action, the Incident Commander and the CIC/JOCC shall be notified immediately.  The Incident Commander shall determine what course of action should be taken.

2.    Regardless of whether a complaint has been filed or is likely to be filed, officials who observe or have reported to them instances of misconduct by members against citizens shall take immediate steps to determine the facts, and shall promptly take appropriate corrective action, if necessary.  Members who observe other members engaging in misconduct against citizens shall report such misconduct to an official as soon as practicable.

**Page intentionally left blank**

# APPENDIX M

# The First Amendment Assemblies Act of 2004

**Page intentionally left blank**

**First Amendment Rights and Police Standards**

First Amendment Assemblies

### § 5-331.01. Short title

This subchapter may be cited as the "First Amendment Assemblies Act of 2004".

### § 5-331.02. Definitions

For the purposes of this subchapter, the term:

(1) "First Amendment assembly" means a demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social, or religious views.

(2) "MPD" means the Metropolitan Police Department.

### § 5-331.03. Policy on First Amendment assemblies

It is the declared public policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways, and in the parks of the District of Columbia, and to engage in First Amendment assembly near the object of their protest so they may be seen and heard, subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways to travel to their intended destinations, and use the parks for recreational purposes.

### § 5-331.04. Reasonable time, place, and manner restrictions on First Amendment assemblies

(a) The MPD shall recognize and implement the District policy on First Amendment assemblies established in § 5-331.03 when enforcing any restrictions on First Amendment assemblies held on District streets, sidewalks, or other public ways, or in District parks.

(b) The MPD may enforce reasonable time, place, and manner restrictions on First Amendment assemblies by:

(1) Establishing reasonable restrictions on a proposed assembly prior to its planned occurrence though the approval of a plan, where the organizers of the assembly give notice;

(2) Enforcing reasonable restrictions during the occurrence of an assembly for which a plan has been approved, which are in addition to the restrictions set forth in the approved plan, where the additional restrictions are:

(A) Ancillary to the restrictions set forth in the approved plan and are designed to implement the substance and intent in the approval of the plan;

(B) Enforced in response to the occurrence of actions or events unrelated to the assembly that were not anticipated at the time of the approval of the plan and that were not caused by the plan-holder, counter-demonstrators, or the police;  or

(C) Enforced to address a determination by the MPD during the pendency of the assembly that there exists an imminent likelihood of violence endangering persons or threatening to cause significant property damage;  or

(3) Enforcing reasonable restrictions on a First Amendment assembly during its occurrence where a plan was not approved for the assembly.

(c) No time, place, or manner restriction regarding a First Amendment assembly shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly, or on factors such as the attire or appearance of persons participating or expected to participate in an assembly, nor may such restrictions favor non-First Amendment activities over First Amendment activities.

### § 5-331.05. Notice and plan approval process for First Amendment assemblies -- generally.

 (a) It shall not be an offense to assemble or parade on a District street, sidewalk, or other public way, or in a District park, without having provided notice or obtained an approved assembly plan.

(b) The purpose of the notice and plan approval process is to avoid situations where more than one group seeks to use the same space at the same time and to provide the MPD and other District agencies the ability to provide appropriate police protection, traffic control, and other support for participants and other individuals.

(c) Except as provided in subsection (d) of this section, a person or group who wishes to conduct a First Amendment assembly on a District street, sidewalk, or other public way, or in a District park, shall give notice and apply for approval of an assembly plan before conducting the assembly.

(d) A person or group who wishes to conduct a First Amendment assembly on a District street, sidewalk, or other public way, or in a District park, is not required to give notice or apply for approval of an assembly plan before conducting the assembly where:

(1) The assembly will take place on public sidewalks and crosswalks and will not prevent other pedestrians from using the sidewalks and crosswalks;
(2) The person or group reasonably anticipates that fewer than 50 persons will participate in the assembly, and the assembly will not occur on a District street; or

(3) The assembly is for the purpose of an immediate and spontaneous expression of views in response to a public event.

(e) The Mayor shall not enforce any user fees on persons or groups that organize or conduct First Amendment assemblies.

(f) The Mayor shall not require, separate from or in addition to the requirements for giving notice of or applying for approval of an assembly plan for a First Amendment assembly, that persons give notice to, or obtain a permit or plan from, the Chief of Police, or other District officials or agencies, as a prerequisite for making or delivering an address, speech, or sermon regarding any political, social, or religious subject in any District street, sidewalk, other public way, or park.

(g) The Mayor shall not require, separate from or in addition to the requirements for giving notice of or applying for approval of an assembly plan for a First Amendment assembly, that persons give notice to, or obtain a permit or plan from the Chief of Police, the Department of Consumer and Regulatory Affairs, or any other District official or agency as a prerequisite for using a stand or structure in connection with such an assembly; provided, that a First Amendment assembly plan may contain limits on the nature, size, or number of stands or structures to be used as required to maintain public safety. Individuals conducting a First Amendment assembly under subsection (d) of this section may use a stand or structure so long as it does not prevent others from using the sidewalk.

(h) The Mayor shall not require, separate from or in addition to the requirements for giving notice of or applying for approval of an assembly plan for a First Amendment assembly, that persons give notice to, or obtain a permit or plan from, the Chief of Police, the Director of the Department of Consumer and Regulatory Affairs, or any other District official or agency as a prerequisite for selling demonstration-related merchandise within an area covered by an approved plan or within an assembly covered by subsection (d) of this section; provided, that nothing in this subsection shall be construed to authorize any person to sell merchandise in a plan-approved area contrary to the wishes of the plan-holder.

### § 5-331.06. Notice and plan approval process for First Amendment assemblies -- processing applications; appeals; rules

(a)(1) Subject to the appeal process set forth in subsection (d) of this section, the authority to receive and review a notice of and an application for approval of a plan for a First Amendment assembly on District streets, sidewalks, and other public ways, and in District parks, and to grant, deny, or revoke an assembly plan, is vested exclusively with the Chief of Police or his or her designee.

(2) Persons or groups providing notice to and applying for approval of a plan from the District government to conduct a First Amendment assembly on a District street, sidewalk, or other public way, or in a District park, shall not be required to obtain approval for the assembly from any other official, agency, or entity in the District government, including the District of Columbia Emergency Management Agency, the Mayor's Special Events

Task Group, or the Department of Parks and Recreation.

(b)(1) The Chief of Police shall take final action on a notice of and an application for approval of a plan for a First Amendment assembly within a reasonably prompt period of time following receipt of the completed application, considering such factors as the anticipated size of the assembly, the proposed date and location, and the number of days between the application date and the proposed assembly date, and shall establish specific timetables for processing an application by rules issued pursuant to subsection (e) of this section.

   (2) Except as provided in paragraph (3) of this subsection, where a complete application for approval of a First Amendment assembly plan is filed 60 days or more prior to the proposed assembly date, the application shall receive final action no later than 30 days prior to the proposed assembly.

   (3) Following the approval of an assembly plan in response to an application pursuant to paragraph (2) of this subsection, the Chief of Police may, after consultations with the person or group giving notice of the assembly, amend the plan to make reasonable modifications to the assembly location or route up until 10 days prior to the assembly date based on considerations of public safety.

(c) The Chief of Police shall inform the person or group giving notice of an assembly, in writing, of the reasons for any decision to:

   (1) Deny an application for approval of a First Amendment assembly plan;

   (2) Revoke an assembly plan prior to the date of the planned assembly;  or

   (3) Approve an assembly plan subject to time, place, or manner restrictions that the applicant has advised the Chief of Police are objectionable to the applicant.

(d)(1) Any applicant whose proposed assembly plan has been denied, revoked prior to the date of the planned assembly, or granted subject to time, place, or manner restrictions deemed objectionable by the applicant, may appeal such decision to the Mayor or the Mayor's designee, who shall concur with, modify, or overrule the decision of the Chief of Police.

   (2) The Mayor shall make a decision on appeal expeditiously and prior to the date and time the assembly is planned to commence, and shall explain in writing the reasons for the decision.

(e)(1) Within 90 days of April 13, 2005, the Mayor, pursuant to subchapter I of Chapter 5 of Title 2, and in accordance with this subchapter, shall issue rules governing the approval of plans to persons or groups seeking to conduct a First Amendment assembly on District streets, sidewalks, or other public ways, or in District parks.

(2) Existing procedures for the issuance of permits to persons or groups seeking to conduct a First Amendment assembly on District streets, sidewalks, or other public ways, or in District parks, that are not inconsistent with this subchapter shall remain in effect pending the issuance of the rules promulgated under paragraph (1) of this subsection.

### § 5-331.07. Police handling and response to First Amendment assemblies

(a) The MPD's handling of, and response to, all First Amendment assemblies shall be designed and implemented to carry out the District policy on First Amendment assemblies established in § 5-331.03.

(b)(1) Where participants in a First Amendment assembly fail to comply with reasonable time, place, and manner restrictions, the MPD shall, to the extent reasonably possible, first seek to enforce the restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the specific non-compliant persons, where probable cause to issue a citation or to arrest is present.

(2) Nothing in this subsection is intended to restrict the authority of the MPD to arrest persons who engage in unlawful disorderly conduct, or violence directed at persons or property.

(c) Where participants in a First Amendment assembly, or other persons at the location of the assembly, engage in unlawful disorderly conduct, violence toward persons or property, or unlawfully threaten violence, the MPD shall, to the extent reasonably possible, respond by dispersing, controlling, or arresting the persons engaging in such conduct, and not by issuing a general order to disperse, thus allowing the First Amendment assembly to continue.

(d) The MPD shall not issue a general order to disperse to participants in a First Amendment assembly except where:

(1) A significant number or percentage of the assembly participants fail to adhere to the imposed time, place, and manner restrictions, and either the compliance measures set forth in subsection (b) of this section have failed to result in substantial compliance or there is no reasonable likelihood that the measures set forth in subsection (b) of this section will result in substantial compliance;

(2) A significant number or percentage of the assembly participants are engaging in, or are about to engage in, unlawful disorderly conduct or violence toward persons or property; or

(3) A public safety emergency has been declared by the Mayor that is not based solely on the fact that the First Amendment assembly is occurring, and the Chief of Police determines that the public safety concerns that prompted the declaration require that the First Amendment assembly be dispersed.

(e)(1) If and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable

order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal.

(2) Except where there is imminent danger of personal injury or significant damage to property, the MPD shall issue multiple dispersal orders and, if appropriate, shall issue the orders from multiple locations.  The orders shall inform persons of the route or routes by which they may disperse and shall state that refusal to disperse will subject them to arrest.

(3) Whenever possible, MPD shall make an audio or video recording of orders to disperse.

(f)(1) Where a First Amendment assembly is held on a District street, sidewalk, or other public way, or in a District park, and an assembly plan has not been approved, the MPD shall, consistent with the interests of public safety, seek to respond to and handle the assembly in substantially the same manner as it responds to and handles assemblies with approved plans.

(2) An order to disperse or arrest assembly participants shall not be based solely on the fact that a plan has not been approved for the assembly.

(3) When responding to and handling a First Amendment assembly for which a plan has not been approved, the MPD may take into account any actual diminution, caused by the lack of advance notice, in its ability, or the ability of other governmental agencies, appropriately to organize and allocate their personnel and resources so as to protect the rights of both persons exercising free speech and other persons wishing to use the streets, sidewalks, other public ways, and parks.

### § 5-331.08. Use of police lines

No emergency area or zone will be established by using a police line to encircle, or substantially encircle, a demonstration, rally, parade, march, picket line, or other similar assembly (or subpart thereof) conducted for the purpose of persons expressing their political, social, or religious views except where there is probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts (other than failure to have an approved assembly plan) and the police have the ability to identify those individuals and have decided to arrest them; provided, that this section does not prohibit the use of a police line to encircle an assembly for the safety of the demonstrators.

### § 5-331.09. Identification of MPD personnel policing First Amendment assemblies

The MPD shall implement a method for enhancing the visibility to the public of the name or badge number of officers policing a First Amendment assembly by modifying the manner in which those officers' names or badge numbers are affixed to the officers' uniforms or helmets.  The MPD shall ensure that all uniformed officers assigned to police First Amendment assemblies are equipped with the enhanced identification and may be identified even if wearing riot gear.

### § 5-331.10. Documentation of arrests in connection with a First Amendment assembly

 (a) The MPD shall cause every arrest in connection with a First Amendment assembly to be documented, in writing or electronically, by the officer at the scene who makes the arrest. (b) Except as provided in subsection (c) of this section, the arrest documentation shall be completed at a time reasonably contemporaneous with the arrest, and shall include:

  (1) The name of the person arrested;

  (2) The date and time of the arrest;

  (3) Each offense charged;

  (4) The location of the arrest, and of each offense;

  (5) A brief statement of the facts and evidence establishing the basis to arrest the person for each offense;

  (6) An identification of the arresting officer (name and badge number); and

  (7) Any other information the MPD may determine is necessary.

(c)(1) The Chief of Police may implement a procedure for documenting arrests in connection with a First Amendment assembly different from that set forth in subsection (b) of this section where the Chief determines that an emergency exists with regard to a specific First Amendment assembly, and that implementation of the alternative procedure is necessary to assist police in protecting persons, property, or preventing unlawful conduct; provided, that any such procedure shall adequately document the basis that existed for each individual arrest.

  (2) The determination of the Chief of Police made pursuant to paragraph (1) of this subsection shall be made in writing and shall include an explanation of the circumstances justifying the determination.

  (3) The determination of the Chief of Police made pursuant to paragraph (1) of this subsection shall be valid for a period of 24 hours, and may be renewed by the Chief, or in the Chief's absence, the Chief's designee.

### § 5-331.11. Use of handcuffs, plastic cuffs, or other physical restraints on persons arrested in connection with a First Amendment assembly.

 (a) The MPD shall adhere to the standard set forth in subsection (b) of this section in using handcuffs, plastic cuffs, or other physical restraints on any person arrested in connection with a First Amendment assembly who is being held in custody in the following

circumstances:

   (1) The arrestee is being held in a police processing center:

      (A) To determine whether the arrestee should be released or the method for release;

      (B) To determine whether the arrestee should be presented to court; or

      (C) Pending presentation to court;

   (2) The arrestee is being held in an unsecured processing center, and is not being held in a cell; or

   (3) The arrestee is charged solely with one or more misdemeanor offenses, none of which have, as one of their elements, the commission of a violent act toward another person or a threat to commit such an act, or the destruction of property, or a threat to destroy property.

(b) With regard to any person who is being held in custody by the MPD in the circumstances identified in subsection (a) of this section, the MPD shall use handcuffs, plastic cuffs, or other physical restraints only to the extent reasonably necessary, and in a manner reasonably necessary, for the safety of officers and arrestees;  provided, that no such person shall be restrained by connecting his or her wrist to his or her ankle, and no such person shall be restrained in any other manner that forces the person to remain in a physically painful position.

(c) Nothing in this section is intended to restrict the otherwise lawful authority of the MPD to use handcuffs, plastic cuffs, or other physical restraints on persons arrested in connection with a First Amendment assembly at the time of or immediately following arrest, while arrestees are being transported to a processing center, or while arrestees are being transported to or from court.

### § 5-331.12. Prompt release of persons arrested in connection with a First Amendment assembly.

 (a)(1) The MPD shall promptly process any person arrested in connection with a First Amendment assembly to determine whether the person is eligible for immediate release pursuant to a lawful release option, and shall promptly release any person so eligible who opts for release.

   (2) The MPD shall promptly release any person arrested in connection with a First Amendment assembly who, it is subsequently determined, should not be charged with any offense, or as to whom arrest documentation has not been prepared and preserved.

(b)(1) The MPD shall require that an officer holding a supervisory rank document and explain any instance in which a person arrested in connection with a First Amendment assembly who opts for release pursuant to any lawful release option or who is not charged

with any offense is not released within 4 hours from the time of arrest.

(2) The MPD shall provide to any person not released within a reasonable time of arrest food appropriate to the person's health.

(c) The Chief of Police shall issue an annual public report that:

(1) Identifies the number of persons in the preceding year who were arrested in connection with a First Amendment assembly and opted for release pursuant to any lawful release option or were not charged with any offense and were not released from custody within 4 hours after the time of arrest;

(2) Discusses the reasons for the delay in processing such persons for release; and

(3) Describes any steps taken or to be taken to ensure that all such persons are released within 4 hours from the time of arrest.

(d) The MPD shall ensure that it possesses an automated information processing system that enables it to promptly process for release or presentation to the court all persons arrested in connection with a First Amendment assembly, and shall ensure that such system is fully operational (with respect to its hardware, software, and staffing) prior to a First Amendment assembly that has a potential for a substantial number of arrests.

### § 5-331.13. Notice to persons arrested in connection with a First Amendment assembly of their release options.

(a) The MPD shall fully and accurately advise persons arrested in connection with a First Amendment assembly of all potential release options when processing them for release from custody or for presentation to court.

(b)(1) The MPD shall provide a written notice identifying all release options to each person arrested in connection with a First Amendment assembly who is charged solely with one or more misdemeanor offenses. The notice shall clearly indicate that the options are alternative methods for obtaining a prompt release, and that the availability of each option is dependent on a determination that the arrestee is eligible to participate in that release option. The notice shall also identify the misdemeanor charges lodged against the arrestee.

(2) The notice required by paragraph (1) of this subsection shall be offered in the Spanish language to those persons who require or desire notice in this manner, and shall be offered in other languages as is reasonable to ensure meaningful access to the notice for persons who are limited English proficient.

### § 5-331.14. Police-media relations

(a) Within 90 days of April 13, 2005, the Chief of Police, pursuant to subchapter 1 of

Chapter 5 of Title 2, shall issue rules governing police passes for media personnel.

(b) Within 90 days of April 13, 2005, the Chief of Police shall develop and implement a written policy governing interactions between the MPD and media representatives who are in or near an area where a First Amendment assembly is ongoing and who are reporting on the First Amendment assembly. The policy shall be consistent with the requirements of subsection (c) of this section.

(c)(1) The MPD shall allow media representatives reasonable access to all areas where a First Amendment assembly is occurring. At a minimum, the MPD shall allow media representatives no less access than that enjoyed by members of the general public and, consistent with public safety considerations, shall allow media representatives access to promote public knowledge of the assembly.

(2) The MPD personnel located in or near an area where a First Amendment assembly is ongoing shall recognize and honor media credentials issued by or officially recognized by the MPD.

(3) The MPD shall make reasonable accommodations to allow media representatives effectively to use photographic, video, or other equipment relating to their reporting of a First Amendment assembly.

### § 5-331.15. Training for handling of, and response to, First Amendment assemblies

The Chief of Police shall ensure that all relevant MPD personnel, including command staff, supervisory personnel, and line officers, are provided regular and periodic training on the handling of, and response to, First Amendment assemblies. The training shall be tailored to the duties and responsibilities assigned to different MPD positions and ranks during a First Amendment assembly. The training shall include instruction on the provisions of this subchapter, and the regulations issued hereunder.

### § 5-331.16. Use of riot gear and riot tactics at First Amendment assemblies

(a) Officers in riot gear shall be deployed consistent with the District policy on First Amendment assemblies and only where there is a danger of violence. Following any deployment of officers in riot gear, the commander at the scene shall make a written report to the Chief of Police within 48 hours and that report shall be available to the public on request.

(b)(1) Large scale canisters of chemical irritant shall not be used at First Amendment assemblies absent the approval of a commanding officer at the scene, and the chemical irritant is reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects.

(2) Chemical irritant shall not be used by officers to disperse a First Amendment assembly unless the assembly participants or others are committing acts of public disobedience endangering public safety and security.

(3) A commanding officer who makes the determination specified in paragraph (1) of this subsection shall file with the Chief of Police a written report explaining his or her action within 48 hours after the event.

## § 5-331.17. Construction

The provisions of this subchapter are intended to protect persons who are exercising First Amendment rights in the District of Columbia, and the standards for police conduct set forth in this subchapter may be relied upon by such persons in any action alleging violations of statutory or common law rights.

# APPENDIX N

# Records Retention

**Page intentionally left blank**

It is the policy of the MPD that records associated with mass demonstrations and protests are retained for a period of no less than three (3) years.  In the furtherance of this policy, the following procedures shall be followed:

In the event of a mass demonstration or protest, either planned or spontaneous, the following members are required to take action to identify and preserve all computer files, communication recordings/radio runs and documents reasonably related to the event. MPD must ensure original documents are preserved.

1.      Commanding Officer, Special Operations Division (SOD), upon notification of a mass demonstration or protest shall:

    a.      Secure a Central Complaint Number (CCN) designated solely for the event.  This CCN shall be used when referring to any records retained which are associated with the event.

            NOTE:  Different CCN's may be obtained for individual incidents which occur during the event, e.g., damage to property, PD 42, arrest(s).

    b.      Designate a secure location within SOD, in which all records (originals and copies) shall be stored.

    c.      Ensure the records are properly marked and indexed with the CCN for the event.

    d.      Serve as the preserver of these records (originals and copies) for a period of no less than three (3) years.

    e.      Seek and receive written permission from the Office of the Attorney General (OAG) **and** the MPD's Office of General Counsel (OGC) prior to moving, surrendering or destroying any records associated with mass demonstrations or protests.

2.      Director, Command Information Center (CIC), upon notification of a mass demonstration or protest shall:

    a.      Contact SOD and ascertain the assigned CCN.

    b.      Ensure all records (originals and copies) relative to the event are retained, indexed, marked with the corresponding CCN and forwarded to the Commanding Officer, SOD, no later than ten (10) days following the event.

        c.        Ensure, upon the activation the Joint Operation Commander Center (JOCC), a running resume shall be initiated and continue until the JOCC is deactivated.  This resume shall be logged, marked with the corresponding CCN and forwarded with all other records to the Commanding Officer, SOD, no later than ten (10) days following the event.

        d.        MPD must ensure that originals are preserved as well.

3.        MPD Liaison Official assigned to the Office of Unified Communication (OUC), upon notification of a mass demonstration or protest shall:

        a.        Contact SOD and confirm the designated CCN assigned to the event.

        b.        Ensure OUC assigns a radio channel to be dedicated to the event.

        c.        Ensure copies of all radio transmissions related to the events are retained, indexed, marked with the corresponding event CCN and forwarded to the Commanding Officer, SOD, no later than ten (10) days following the event.

        d.        MPD must ensure that originals are preserved as well.

4.        Photographic or Video Recording or Surveillance

        a.        Commanding Officers of units having members assigned to (or those with the capability to) utilize government issued equipment to engage in photographic or video recording or surveillance (audio and/or video, still photography) any mass demonstration or protest shall establish a log book to index any recordings of any mass demonstration or protest.  The log book shall contain:

        1)        Members name and assignment;

        2)        Equipment and recording media used;

        3)        Dates, Times and location(s) of the recordings;

        4)        Notation of the indexing and logging of return of all media used.

        b.        Members who are assigned to (or those with the capability to) utilize government issued equipment to engage in photographic or video recording or surveillance shall, upon completion of the assignment,

1)      Label all recordings with the event number along with the time(s) and location(s) the recording(s) were taken and the operators badge number and CAD number.

2)      Document their use of photographic or video recording or surveillance in the unit's log book.

          NOTE:  If no recordings are taken, note such in the log book.

3)      Ensure originals and copies of all recordings related to the events are retained, properly marked and forwarded to the Commanding Officer, SOD, no later than ten (10) days following the event.

4)      Ensure copies of the log book are properly marked and forwarded to the Commanding Officer, SOD, no later than ten (10) days following the event. (The original log book shall be retained at the organizational element.)

c.      Members who may utilize their personal equipment to take photographs or record video (e.g., personal cell phone) shall preserve any photos or recordings in accordance with GO-SPT-601.02 (Preservation of Potentially Discoverable Material).